NATIONAL LABOR RELATIONS BOARD
v. ALUMINUM PRODUCTS CO. et al.

No. 7333.

Circuit Court of Appeals, Seventh Circuit.

March 4, 1941.

568

Robert B. Watts, Gen. Counsel, N. L. R. B., of Washington, D. C., for appellant.

Arthur W. Sprague, of Chicago, Ill., for appellees.

Before EVANS, Circuit Judge, and LINDLEY and BRIGGLE, District Judges.

LINDLEY, District Judge.

Petitioner seeks to enforce its order entered against respondents. Complaint issued on April 15, 1936, it being averred therein that respondents had engaged and were engaging in unfair labor practices within the meaning of Section 8 (1), (2), and (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 2, 5). Respondents' motion to dismiss was denied. The examiner heard evidence during April, May and June, 1936, and on July 25 of that year, filed his report, finding that respondents had engaged in unfair labor practices as averred and recommending that they be directed to desist and to perform certain affirmative remedial acts. The Board denied a motion to reopen the record and receive further evidence, heard oral argument, and on June 28, 1938, rendered its decision.

The Board found that respondents had dominated and interfered with the organization and administration of and supported an independent union, known in the record as the Utensil Makers, in violation of Section 8 (1) and (2) of the act; that they had thereby interfered with, restrained, and coerced their employees in the exercise of rights guaranteed by Section 7 of the act, 29 U.S.C.A. § 157, in violation of Section 8 (1); that they had discriminatorily failed to reinstate or discharged, between October 1, 1935, and April 9, 1936, some twelve employees, because of their membership in the so-called "LaGrange" and "Lemont" Locals, affiliated with the American Federation of Labor, thereby violating Section 8 (1), (3) and (4); that respondents had, on the first two days of the hearing before the examiner, closed down the Lemont plant in order to demonstrate to their employees their objection to the proceeding instigated by the locals affiliated with the A. F. of L., and thereby further interfered with, restrained, and coerced their employees in the exercise of their rights guaranteed by Section 7 of the act in violation of Section 8 (1).

The order directed respondents to desist from the unfair practices found to exist and to take affirmative action as follows: (1) withdraw all recognition from Utensil as representative of their employees for the purpose of collective bargaining and "disestablish" it as such representative; (2) reinstate with back pay twelve employees found to have been discriminated against, except one (who declined reappointment),

and (3) make whole all Lemont employees who were employed on April 29, 1936, for loss of wages suffered by them by reason of the closing of the Lemont plant for two days on April 30 and May 1, 1936.

The issues involved in this review originally were whether (1) the act is applicable to respondents, (2) the findings of fact are supported by substantial evidence, (3) the order is valid, and (4), the Board improperly denied motion to reopen the record and receive further evidence.

In raising the first of these issues, respondents relied upon N. L. R. B. v. Jones & Laughlin Corp., 3 Cir., 83 F.2d 998. In view of the reversal of that decision, N. L. R. B. v. Jones & Laughlin Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, under the facts of this record, respondents' contention in this respect must be denied. The facts disclose that respondents are intimately associated in a joint enterprise, as affiliated corporations, under the same management, engaged in an industrial operation which involves a direct and continuous flow of commerce across state lines to the market. N. L. R. B. v. Sunshine Mining Co., 9 Cir., 110 F.2d 780; Electric Bond & Share Co. v. Securities & Exchange Commission, 303 U.S. 419, 58 S. Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105.

Is there substantial evidence to support the Board's finding that respondents have engaged in unfair labor practices? In this respect the facts relied upon by the examiner and the Board, supported by the record, are, in part, substantially as we now relate them. At the time of passage of the act, a strike was in progress at each of the two plants of respondents, one at LaGrange and the other at the smaller neighboring town of Lemont. The employees were then organized in two local unions affiliated with the A. F. of L. with substantially unanimous membership at each plant. After negotiating with respondents' officials, being unable, as they say, to agree upon a satisfactory contract of employment, they had on June 13, 1935, entered upon the strike, which persisted after the enactment of the law until July 29, 1935. During its existence both plants were closed. Negotiations between the unions and respondents resulted in a proposed written contract dated July 27, 1935, to the terms of which both parties assented but which was never signed. It remained, for all effective purposes, a valid parol contract. In pursuance of this agreement, the strike was terminated upon certification by a federal conciliator and the Board's regional director that respondents and the unions had signified that the oral contract should constitute the basis of relationship until August 1, 1936.

Following reopening of the plants, the employees and respondents found themselves involved in considerable confusion and some disagreement and, eventually, as a result, the independent union known as Utensil Makers came into existence. The Board found that respondents planned and encouraged replacement of the locals with the Utensil. In doing so it relied in part, at least, upon statements by Vice-President Matter of respondents, made several times during the pendency of the strike, that respondents were endeavoring to organize the employees at LaGrange into a union independent of the A. F. of L.; that if the employees at Lemont did not go into it, they "would be left out." The Board gave credence to testimony that the superintendent of the Lemont plant announced that respondents would never go along with the A. F. of L. In August, 1935, respondents' president, Hastings, posted a notice, addressed to the LaGrange employees, stating that the company had lost a "good deal" of business because of the strike and that some time would be required to rebuild it to provide jobs for many of the workers employed prior to the strike. The employees were disturbed by this notice and by statements of Superintendent Wright of the LaGrange plant that the agreement of July 27 was "no good"; that the men could not return to work so long as they remained members of the A. F. of L., and that respondents would enter into an agreement with the employees as "good if not better than the contract of July 27, if they would withdraw from the A. F. of L." Following these statements, one Snyder and Superintendent Wright's son, Earl Wright, Jr., the latter of whom lived in the same house with his father, began the circulation of a petition withdrawing from the A. F. of L., repudiating the July 27 agreement and providing for the formation of an independent union. Young Wright held no supervisory position with respondents and his only relationship with respondents relied upon by the Board grew out of the fact of close association of father and son in one home, coupled with the statement, attributed by a witness to the son, to the effect that there were in his father's house proper petitions and that he would procure some of them

for circulation. Upon these circumstances, the Board believed it proper to consider young Wright's actions.

On August 26, the employees who had signed the petition circulated by young Wright and Snyder held a meeting at which it was announced that the agreement of July 27 was of no value and that the employees "could get nowhere with the A. F. of L." It was suggested that the men resign in a body, join the new organization and request the company to recognize it. On August 27, a committee of Utensil Makers called upon respondents' vice-president, Matter, and presented to him the petition. Mr. Matter received it and replied that that was "fine; now we can do some business." He said further that he would help the new organization obtain a charter and that respondents would sign an agreement similar to the statement of policy made by the Aluminum Company of America. The committee informed Mr. Matter that the men feared they might be punished if they resigned from the A. F. of L. and organized a company union, and he suggested that they consult the Board's regional director. He declined to address the Utensil Makers until they had resigned from the locals and completed their organization, saying that he would "be put in jail because he would be violating the Wagner Act," and assured them that they must act independently.

That night a joint membership meeting of the locals of both LaGrange and Lemont was held. The question was raised and discussed as to whether the men should remain loyal to the A. F. of L., resulting finally in a vote of confidence, in which all joined including those present who had become representatives of Utensil Makers.

The next day Vice-President Matter wrote the new union that the company would recognize it as the bargaining agent and negotiate with it a new agreement, and, on the evening of the same day, Utensil Makers again met. They had invited each of the LaGrange and Lemont locals to attend. Withdrawal from the A. F. of L. was again considered and apparently everyone was in favor of a motion to reaffirm allegiance to the A. F. of L., to advise Mr. Matter of this determination and to request him to return the petition Utensil Makers had lodged with him. On the next day, when the committee called upon Matter and requested the petition, he said that the July 27 agreement was of no effect and that it would be "foolish" for him to return

their petition. Conference was then had with the regional director, after which the committee of Utensil Makers continued with organization of that union.

Respondents permitted representatives of Utensils to consume employment time and to use its property freely for organization purposes. Through September, October and November, Utensil Makers secured many signatures of LaGrange employees solicited during working hours in the presence of supervisory employees. The various documents were left on tables in the plant and the employees freely requested to sign. Certain officials sought to compel employees at LaGrange to join Utensil Makers by discharging or failing to reinstate employees who proved recalcitrant, by permitting Utensil Makers in the presence of supervisors to require membership in their organization as a condition precedent to employment and by restricting employment at LaGrange to members of Utensil Makers.

At a meeting of September 11, Vice-President Matter told the men that they would receive higher wages if they repudiated the A. F. of L. agreement of July 27; that he would help the new organization obtain a charter; that "all the A. F. of L. was good for was to collect 35 cents" from the employees and that that organization had no other regard for them.

Following this a committee from Utensil Makers approached the Lemont employees. The superintendent there, Lynch, had urged the president of the Lemont Local to abandon the A. F. of L. and to attempt to persuade the Lemont employees to form a company union. Before proceeding to Lemont the committee requested Matter to close the plant during the conference, saying that the Lemont employees would not cease work to listen and that it might help if he would close the plant without loss of wages. Matter agreed to do so and telephoned the superintendent. When the committee arrived, the power was shut off and the employees gathered at one end of the shop. Superintendent Lynch presented the committee. The president of the Lemont Local said "Mr. Lynch do we have to listen to these fellows." Mr. Lynch replied that they did not. The Lemont employees then left the room. The members of the committee from Utensil Makers who went to Lemont were not docked at LaGrange for the time taken out for the visit.

Within a few moments after the committee left Lemont, Mickel, president of the Local there, was laid off. Some days later, Superintendent Lynch told him that a new company would take over the Lemont plant and would not be bound by the July 27 agreement with the A. F. of L.; that he had been thinking of giving Mickel a job as overseer; that all he had to do was "go out and tell those fellows to start a union of their own."

The Board relied also upon the fact that Utensil Makers became largely inactive after it supplanted the Local at LaGrange, failing to hold meetings, publish by-laws and membership cards or collect dues. Only some months later, after the proceeding had been instituted, were dues collected for the first time. Some seven months after its organization Utensil tacitly acceded to the Aluminum Company's statement of labor policy, which contained no reference to unions and indicated no intent to improve wages, hours of work or other labor conditions. The Board believed this inertia persuasive indication of Utensil's lack of independence.

The Board found in letters of Mr. Hastings language which, in connection with other evidence, it believed carried necessary implications of attempted influence over the employees in selecting their bargaining agent. Among these were declarations that the Lemont plant would be closed, as the employees were dominated by "professional agitators"; that the Local's strike committee was unfair to the employees in the manufacturing department; that the July 27 contract was a "sour ball for the workers"; an intimation that A. F. of L. leaders had deceived the employees with false promises and a comparison of the lot of the Lemont Local members with that of Utensil Makers at LaGrange, in the respect that the latter selected their own committees without influence from "outside organizers" and, as a consequence, had abundant labor. We confess that some of the inferences drawn, upon reading of the entire documents involved, appear far fetched; but we are not justified in saying that, considering other evidence, they are unsupported.

Upon this and other direct and indirect evidence which we deem it unnecessary to refer to specifically, the Board concluded that respondents attempted to undermine the employees' loyalty to their existing unions, and to persuade them to install in their stead an independent union with which respondents interfered and which they dominated and supported. The evidence was sharply controverted by witnesses who testified in behalf of respondents and the latter argue that upon examination of the entire record, the circumstances which are ordinarily recognized as affecting credibility were such that it cannot be said that the evidence relied upon by the Board was sufficient,—of such character as to substantiate and support the ultimate findings. But it is to be recalled that the act, with the policy of which we are in no wise concerned, contemplates that the triers of the facts shall be the judges of the credibility of the witnesses. The employer must preserve the utmost of neutrality, so far as the employees' right to organize and designate their bargaining agents is concerned. There was substantial evidence, which the Board believed, that the supervisory employees and officials made known to the men their dislike for the A. F. of L., that they advised the employees that that organization was interested only in receiving dues; that employees could not return to work, so long as they remained members of the A. F. of L.; that the employees should not be controlled by outside organizers; that, when an independent union was organized, the vice-president approved and remarked that that was "fine"; that "they could now get somewhere," and promised to help the organization obtain a charter; that the favored union was permitted to use company time and company premises in the solicitation of memberships; that respondents implied generally, not always by direct words but by various acts, that they preferred the independent over the A. F. of L. unions. It may be that the Board improperly gave what other persons would think undue credit to various circumstances. But it is not for us to determine the credibility of witnesses; that is the function of the triers of the facts. Nor is it for us to philosophize upon what is the wiser plan for promoting peaceful and healthful relationship between employer and labor; that function is lodged in the Congress.

Consequently, despite the disputable character of much of the evidence, we feel it far beyond our province to conclude that the Board was unjustified in its beliefs and in its extension of credibility. In view of direct evidence of statements

that no work would be available at the La-Grange plant to members of the A. F. of L.; that respondents would not "go along with A. F. of L."; that President Hastings warned the employees against the domination of "professional agitators," denounced the union's strike committee as "not fair" to the men in the manufacturing departments, intimated that A. F. of L. leaders had deceived them with promises, and contrasted the Lemont strikers who were members of the A. F. of L. with the LaGrange workers, who were free of the influence of outside organizers, we conclude that it can not be said that the Board acted arbitrarily when it found respondents had influenced, coerced and interfered with their employees in the latter's determination of their bargaining agents.

One of the discharged employees, Perry, about August 15, 1935, conferred, in company with Jesse Greene, with Superintendent Wright concerning reinstatement. Wright told the two men that employees would not be reinstated as long as they retained membership in the A. F. of L. Both subsequently applied for work but neither was ever reemployed. Though this evidence was controverted, the Board gave credit to the witnesses so testifying.

■ Henry Anderson, a former employee, was called in on October 12, 1935, to report for work. Dolgner, an official of Utensil Makers, asked him to sign the petition for that organization and advised him he could not go to work unless he did so. Anderson reported this to his foreman, who instructed him to see Dolgner again. He found Dolgner in the office of the superintendent, who at that time gave Anderson a time card and told him to go to work. Dolgner again asked Anderson to sign the petition. Anderson refused and returned the time card and said that he was not going to work. The Board found that respondents had failed to reinstate him because of his refusal to transfer his allegiance to Utensil Makers but we find nothing in the evidence to substantiate this conclusion. There was no refusal of employment. On the contrary he was given a time card and told to go to work. It was not the employer's function to inject himself into the controversy between the unions and the Superintendent wisely refrained from interfering. Rather he unconditionally reinstated Anderson and the latter voluntarily refused to work.

Certainly no further obligation was entailed upon the employer.

Harry Arthur Anderson was laid off June 11, 1935. He participated in the strike. The company never reemployed him. He and Christopher Courtley attended a strike settlement conference in October, 1935. Superintendent Lynch told Courtley that he had not been called because he had employed one Jones who did Courtley's work. But at that time Lynch made the significant statement that it was too bad Courtley had been a member of the first union committee; that if he had not, he, Lynch, did not believe his "troubles would have been as hard" as they had been. In view of these circumstances and the failure of respondents to furnish any further light upon the failure to employ these two workers, the Board concluded that they were discriminated against because they were members of the A. F. of L. union. National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862; Montgomery Ward & Co. v. National Labor Relations Board, 7 Cir., 107 F.2d 555.

The Board found that Leo Kozlowski, Stanley Nickleski and Frank Sniegowski were discharged because of their membership in the LaGrange Local affiliated with the A. F. of L., and their refusal to join Utensil Makers. They returned to work after the strike of 1935 but did not join Utensil Makers. They refused to sign its petition. They were discharged on October 4, 1935.

The Board found that Michael Snyder, Stanley Godzick and Stanley Janca were discharged on December 4, 1935, because they had participated in the October strike and had withdrawn allegiance from Utensil Makers. All three had been active members of the LaGrange Local but had joined Utensil Makers upon their return to work. On October 12 they left Utensil Makers and reaffirmed loyalty to the A. F. of L. union, participating in the strike then in existence. Respondents refused to reinstate the men, saying that they might work at the Lemont plant. Respondents sent a telegram to that effect, which, however, did not constitute an unconditional offer of reemployment and which the Board justifiably believed to be merely a part of the negotiation for settlement of the strike. The Board concluded from the circumstances that the failure to reemploy was

inspired by their membership and activities in behalf of the LaGrange Local and their desertion from the ranks of Utensil Makers.

The Board concluded also that respondents had improperly laid off Emanuel Mickel and George C. Boe at Lemont from October 2 to October 7, 1935. It was Mickel who had asked Superintendent Lynch whether the men at Lemont had to listen to the Utensil Makers committee from La-Grange on October 2. Following this event Mickel was laid off. The superintendent told him that he did not intend to lay him off for more than one day but that a mistake had been made and instructed him to return to work October 7. But at that time the Lemont employees were on strike. Mickel returned to work on December 3, 1935, and continued until May 4, 1936, when he was discharged because of his union membership and activity, as the Board said, and because he had filed charges in this proceeding. Mickel was president of the Lemont Local. The company claimed that it discharged him because he improperly filled out bills of lading. This Mickel denied and the Board accepted Mickel's testimony and concluded that there was no excuse for his discharge.

Boe was discharged on April 9, 1936. He had returned to work after the strike in December, 1935, doing maintenance work and, finally, labor in the shipping room. He was one of the leaders of the Lemont Local who filed the charges in this case. On April 4, the superintendent gave Boe a lay-off notice, saying that he had not sufficient work for two maintenance men. But at that time Boe was working in the shipping room, and the Board did not believe the testimony as to the excuse given for his discharge.

Perhaps other triers of the facts would have found differently as to the cause of these discharges or failures to employ. But it is wholly futile to speculate upon such contingencies. Though the evidence may appear unsatisfactory to some, after careful consideration of all the facts, we are unable to say that there was failure of substantial evidence to support the findings.

The Board included a direction that respondents should make whole all the Lemont employees employed by respondents on April 29, 1939, for the loss suffered by reason of closing the plant on April 30, 1936, and May 1, 1936. We find in the record no justification for this direction.

For the first two days of the hearing of the charges respondents and employees were uncertain as to the time that might be consumed, the witnesses who might be requested to attend and other features that might be involved in the hearing. As soon as it became apparent that it would be unnecessary to keep the plant closed, in order that the proceedings might progress without interruption, it was reopened. This portion of the order is wholly unsupported by substantial evidence.

Respondents insist that the order should not be enforced because it is based on findings some four years old and further, because it has been allowed to remain in desuetude for some two years. But we do not understand that orders lose their validity or cease dynamic existence merely because the Board delays in seeking an enforcement order. From the time of its entry, it was binding upon respondents. If they believed it should not be enforced, they had a right to assert such belief in a proper proceeding. This they failed to do.

However, labor conditions at the plants, the relationship between the employers and employees and the controlling facts and circumstances may have changed entirely in the period mentioned. Obviously the order must be without prejudice to the rights of employees, if they should see fit, to seek in a proper proceedings certification of another bargaining agent.

Respondents move in the alternative for leave to produce additional evidence. A similar motion was presented to the Board and denied. The showing in this respect does not indicate any more than an offer of testimony, similar to that which was received. In other words, the proffered testimony appears to be merely cumulative and might have been presented at the hearing. No valid excuse for its nonproduction is offered. Rather the excuse for failure to produce at the hearing is that at that time respondents did not think the Board had established a prima facie case and did not believe that they were subject to the provisions of the act. The record discloses that at the close of the evidence, the trial examiner inquired directly whether respondents intended to submit further evidence and received the reply "No counsel, I will be frank with you,—I am willing to rest." The application to offer additional evidence, therefore, comes too late. N. L. R. B. v. Jones & Laughlin Steel Corp., 301

U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L. R. 1352.

 If the respondents have complied with any portion of the order, obviously, to the extent that they have complied, there is no necessity of their performing again.

Except as we have held otherwise in the course of this opinion and, subject to what we have announced, the petition to enforce will be allowed.