## NATIONAL LABOR RELATIONS BOARD v. PICK MFG. CO.
### No. 7999.

Circuit Court of Appeals, Seventh Circuit.

May 4, 1943.

Frederick P. Mett, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, and David Findling, Atty., National Labor Relations Board, all of Washington, D. C., and Daniel Baker, of New York City, on the brief), for petitioner.

Carl B. Rix, of Milwaukee, Wis. (Rix, Kuelthau & Kuelthau, of Milwaukee, Wis., of counsel), for respondent.

Before SPARKS and MINTON, Circuit Judges, and LINDLEY, District Judge.

MINTON, Circuit Judge.

The National Labor Relations Board, hereinafter referred to as the Board, seeks enforcement of its order of October 9, 1941. The Board found the respondent had violated Sections 8 (1), (2), (3), and (4) of the National Labor Relations Act, 29 U.S.C.A. Sec. 158 (1), (2), (3), (4). The only question presented by this record is whether there is substantial evidence to support the Board's findings.

In 1934 when the respondent's employees sought to organize under the National Industrial Recovery Act, the respondent with vigor stamped out the attempts. Several of its employees were discharged at that time because of their union activities.

No organizational activities took place after that among the respondent's employees until June, 1939. In that month, an organization meeting was held at the farm of Raymond Kircher, an employee of the respondent, and an American Federation of Labor organizer was present. A second meeting was held at Kircher's farm a few days later. A campaign of solicitation for membership got under way at the respondent's plant. The company officials knew about the meetings at Kircher's farm. Justman, an Assistant Superintendent, learned about them from his brother, who had attended.

The Union, a local affiliated with the American Federation of Labor, sought recognition as the bargaining agent of the respondent's employees. The respondent refused to recognize the Union, and an election was ordered by the Board on petition of the Union. The Union lost the election.

That night Robert Pick, the Vice President of the respondent, and some of the employees met at a bowling alley, had some drinks, and celebrated the defeat of the Union.

A few days after the Board had ordered an election held, the respondent's President, Carl Pick, said to an employee, "I don't want that damned union. I would sooner have my own union, I would sooner have my own money in my own pocket."

At about the same time, Assistant Superintendent Justman was very active in his efforts against the Union. He warned an employee about getting "tangled up in this mess," and referring to the abortive attempt to organize in 1934, said, "You know what happened the other time. The thing was ironed out and a lot of fellows lost their jobs and were left holding the bag. The same thing might happen this time." A week before the election, Justman told another employee, "It is only the scrummy stuff of the underworld type that listens to another man from another city, so it is a good thing for the working people to learn how to think for themselves, and they wouldn't fall prey to such stuff." Justman also reminded this employee, who had been laid off for union activity in 1934, that he "should be careful how he voted, otherwise he would be on the outside looking in again." He said that if the employees wanted a union, they should pick their leaders and start an independent union. Just before the election, Justman wrote on a slip of paper for an employee the words "Yes" and "No," and asked the employee which was easier to write, and then stated, "If you say 'Yes' and Pick says 'No,' where are you going to be? You will be out, won't you? * * * If you are independent, your dollar is in your own pocket * * *. Why * * * give it to some outsider * * *."

On the day before the election, the Union President, talking to fellow employees, said rumors were out that if the Union won, the respondent would place in effect some undesirable practices with ref-

erence to transfers during slack periods. To this Justman said, "You will find it will work out that way, after the union gets in," and stated further the employees "couldn't hope to get any place with the union," that the respondent was already paying "top wages" and that if the Union "gets in, that is just two dollars out of your pocket. That is just money gone. There is some things you can get something out of and some things that you can't." Just prior to the election, Justman advised another employee, who later became active for the Independent Union of Pick Workers, that said employee "should be 100% with the Independent Union and (he) would be all right."

■ These facts, when coupled with the further fact that the respondent was guilty of discriminatory acts in the hire and tenure of its employees, as we subsequently find, constitute interference, intimidation and coercion within the meaning of Section 8 (1) of the Act.

The President of the respondent company may have the right to make the statement he made, under his constitutional right of free speech, but he cannot deny that the statement was coercive, intimidating and interfering in its effect. The right of free speech is not absolute. It is a relative right. No one can prohibit the right of the President, Mr. Pick, to speak his views; but if he speaks them, he takes the consequence of his having spoken, just as one does if he speaks slanderously of another. As Justice Holmes once said, the right of free speech does not give one the right to yell "fire" in a crowded theater. We may allow free speech, and yet protect others from injury thereby. Free speech does not mean license to speak without restraint. The statement of President Pick and the many acts and statements of Assistant Superintendent Justman were clear evidence of intimidation, interference and coercion. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Automotive Maintenance Machinery Co., 315 U.S. 282, 62 S. Ct. 608, 86 L.Ed. 848; Rapid Roller Company v. National Labor Relations Board, 7 Cir., 126 F.2d 452; National Labor Relations Board v. Sunbeam Electric Company, 7 Cir., 133 F.2d 856.

■ The respondent claims it was improper to consider the record of the Labor Board under the National Industrial Recovery Act, because that was the proceeding of an unconstitutional tribunal. The record in this case was not introduced as a record to speak the binding effect of that record as such. Only the facts surrounding the making of that record were considered. This was proper evidence to be considered as background in the case. The other evidence was substantial, and sufficient to sustain the Board without this item.

■ We now consider the finding of the respondent's violation of Section 8 (2) of the Act. The Independent Union was formed in January, 1940, shortly after the Union had lost the election. The attitude of the respondent towards the Union we have indicated above in pointing to the unfair labor practices in violation of Section 8 (1) of the Act.

Assistant Superintendent Justman was not only active against the Union, but was decidedly favorable to the organization of the Independent. In fact, his brother, Rufus, became its first President. Assistant Superintendent Justman had advised employees that it would be nice to have the Independent Union, and that way they would not have to let their money go out of town. He had urged the employees to be one hundred per cent for Independent, and instructed an employee to solicit membership for Independent inside the plant during working hours; and solicitation on behalf of the Independent was carried on by employees on the company's premises during working hours. At least one employee was peremptorily discharged for alleged solicitation on the respondent's premises on behalf of the Union.

One week after the Independent held its first meeting, it asked to be recognized as bargaining agent for the employees, and the respondent quickly granted such recognition. This action was in contrast to the respondent's demand for an election when the Union asked recognition as bargaining agent. Although the respondent was quick to recognize the Independent Union as bargaining agent, no bargaining took place between the Independent and the respondent thereafter until this proceeding was under way, and the agreement to bargain with the Independent was signed by the President of the respondent and remained lying upon his desk, until October, 1940.

We think this evidence sufficient to sustain the Board's finding that the respondent had dominated and contributed to the sup-

port of the Independent Union, in violation of Section 8 (2) of the Act.

■ The respondent was found to have violated Section 8 (3) of the Act by certain discriminatory conduct in the hire and tenure of Raymond Kircher, Norbert Matenaer, Lester Dunst, Oscar Bumiller, and Roy Classey.

One Raymond Kircher had been employed by the respondent since 1930, and had worked at various jobs throughout the plant. At one time he had substituted for a key man during such key man's absence of over a month. Kircher led in the organization of the Union, and held two of the first meetings therefor at his farm. What transpired at these meetings was made known to the Superintendent, Meyer, and to Assistant Superintendent Russell Justman by Ray Justman, who had attended the meetings. Immediately thereafter, Kircher was told by Superintendent Meyer that he, Meyer, had orders to lay Kircher off, that work was slack. Kircher remonstrated that he was an older man and others should be laid off before him, whereupon the Superintendent stated that if Kircher wanted to know about it, he would have to go to the main office. Kircher was never recalled thereafter.

The Board was not impressed with the reason assigned by Superintendent Meyer for the discharge of Kircher. It had always been the policy throughout the years that Kircher had worked for the respondent to transfer the older men about in the plant during slack periods in order to keep them working. It further appeared that at the time Kircher was discharged, he was working on an order that had not been completed. The respondent also contended that twelve other employees were laid off at the same time as Kircher, but these men were temporary employees and none of them had anything like the seniority of Kircher; and also, one of them was charged with drunkenness. The respondent also claimed that Kircher's work was not satisfactory, but no complaints had theretofore been made, and the respondent produced no records of Kircher's deficiencies. It further appears from the record that work was not as slack as the respondent pretended, and that at least three new employees were employed and others were transferred into the departments where Kircher had theretofore regularly worked.

Lester Dunst was one of the Union's most active workers. He had helped in its early organization meetings, served as the Union's Temporary Chairman, solicited employees to join, and distributed Union literature about the plant. Production Engineer Dooley had seen Dunst distributing literature, and questioned him about the need of a union in the plant. Dunst was elected Vice President of the Union in October, 1939. He was discharged summarily on November 14, 1939, after approximately four years of employment with the respondent, because he had handed to one Timm, a fellow employee, a Union application card at the time they were both checking out at the time clock. No rule had been promulgated against soliciting on the company's premises, and employees engaged in solicitation for the Independent were permitted to do so freely on the company's premises and during working hours. Dunst was not given a hearing nor was an investigation made, as had been the custom theretofore before discharging one for any alleged misconduct.

Oscar Bumiller was one of the oldest press department employees. He was one of the outstanding leaders of the Union, and one of the employees that had felt the sting of the respondent's anti-union attitude back in 1934 when the employees had tried to organize. In October of 1939 he became a trustee of the Union. Shortly thereafter, he had been warned by the Assistant Superintendent to be "careful" how he voted in the forthcoming election or he "would be on the outside looking in again." Bumiller had testified to this and other anti-union incidents of the respondent in hearings before the Board prior to the hearings on the complaint in this case. On August 8, 1940 Bumiller was laid off for a week without any explanation. He was the only employee in the press room laid off at this time, although he was, with the exception of four other men, the oldest employee in length of service in the department. At the end of the week, he was reemployed until August 26, 1940, when he was laid off again, and never rehired. At the time he was last laid off he was told by his foreman in confidence that he had better seek a job elsewhere. There was no finding that his first layoff was not discriminatory.

The respondent claimed that Bumiller was laid off because business was slack and because he had not signed an employment contract. Just why Bumiller was discharged because he did not have an em-

ployment contract is not clear, when it appears that at least ten other persons were retained who did not have contracts. The obscureness of the respondent's contention that Bumiller was discharged because he did not have an employment contract is further emphasized by the fact that Bumiller, when he learned that respondent claimed to have laid him off because he had no contract, requested to be permitted to sign a contract and was refused.

The Board found that the respondent had discriminatorily reduced the number of working hours of one Roy Classey, and that this was because of his Union activities. Classey was President of the Union and had testified at the Board hearings late in July, 1940, as to certain unfair practices of the respondent. Shortly after the hearing at which he had testified closed, his work week was reduced without prior notice or explanation. Theretofore, he had been working forty-two hours a week, and he was cut down to thirty-two. His fellow workmen in the same department continued without reduction. This reduction to Classey in the hours of work was a departure from the former practice of the respondent. There seems to have been no justification for the special treatment accorded to Classey. The respondent claimed that it was following an experiment that it was trying out in this department, but Classey was the only one upon whom the experiment was tried.

As to Kircher, Dunst, Bumiller and Classey, we think there was substantial evidence to support the Board's finding that they were discriminated against in violation of the provisions of Section 8 (3) of the Act.

Norbert Matenaer was discharged on July 26, 1939, after having served six years with the respondent. He was active in the organization of the Union, but held no office nor prominent position therein. There is no evidence in the record that any official of the company knew that Matenaer belonged to the Union. He was discharged, as the respondent contended, because he had negligently broken a die. There is no dispute but that he broke the die, and he did it through his own carelessness. Matenaer had no illusions as to why he was discharged, and testified that he was discharged because he was careless in running the press and because of his carelessness he had "chipped up a die." After his discharge, Matenaer established himself in the tavern business and made no attempt to return to his former employment. He apparently understood quite well why he was discharged. In reporting to the Board concerning Matenaer, the respondent had said in a letter:

"His general attitude toward his job was, —that he was kind of a complainer.

"During the last few months his attitude has been rather bellicose. He gave the impression that he was looking for trouble."

From these words contained in this letter, the Board inferred the respondent believed Matenaer to be bellicose because of his Union activities, although there is not a scintilla of evidence to support such inference, other than the statement contained in the letter. From this inference that he was bellicose because he was a Union man and because of his Union activities, the Board then drew another inference—that the respondent discharged Matenaer because of his Union activities. We have only recently condemned the drawing of one inference upon another, and held that findings reached in this manner were not supported by substantial evidence, Interlake Iron Corporation v. National Labor Relations Board, 7 Cir., 131 F.2d 129, and we so hold with reference to this item. It thus appears that the Board has inferred that Matenaer's discharge was because of his Union activities, when there is no evidence in the record that the officials of the respondent knew that Matenaer belonged to the Union. Even if there were evidence that his membership was known to the officials of the respondent, that in and of itself would not be substantial evidence to warrant the Board's inferring that he was discharged because he was a member of the Union. We think there is not only no evidence to support the finding of the Board that Matenaer was discriminatorily discharged, but we think the undisputed and only credible evidence in the record is to the effect that he was discharged because he had carelessly broken a die, that he well understood that to be the cause for his discharge, and that he accepted the verdict without any reservation and went ahead to establish himself as a tavern keeper.

With the exception of the case of Matenaer, we think there is substantial evi-

dence in the record to support all of the findings of the Board. The Board's order will be enforced in all respects except as to Matenaer, and the Board may submit an order for that purpose.