**ELASTIC STOP NUT CORPORATION v.
NATIONAL LABOR RELATIONS
BOARD.**

No. 12740.

Circuit Court of Appeals, Eighth Circuit.

May 1, 1944.

Charles E. Whittaker, of Kansas City, Mo. (Henry N. Ess and Watson, Ess, Groner, Barnett & Whittaker, all of Kansas City, Mo., on the brief), for petitioner.

Guy Farmer, Associate Gen. Counsel, National Labor Relations Board of Washington, D. C. (Alvin J. Rockwell, Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and Joseph B. Robison and William J. Avrutis, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before GARDNER, WOODROUGH, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

This is a petition to review and set aside an order of the National Labor Relations Board based on the Board's findings and its conclusion that petitioner had been and was engaging in unfair labor practices in violation of section 8(1) of the National Labor Relations Act, 29 U.S.C.A. § 158 (1). The Board prays for enforcement of its order.

The order in substance requires petitioner to cease and desist from (a) recognizing the Employees Benevolent Association Union (hereinafter called the Association) as bargaining representative of its employees until and unless the Association is certified by the Board; (b) giving effect to any contract with the Association (with certain exceptions); (c) in any manner interfering with its employees in the exercise of the right of self organization. And to affirmatively (a) withdraw and withhold recognition from the Association until and unless certified by the Board; (b) to post notices; (c) to notify the regional director.

The Board in its summary headed "Concluding Findings" found that petitioner "interfered with, restrained, and coerced its employees in the exercise of their rights guaranteed in section 7 of the Act [29 U.S.C.A. § 157]" by the statement of its foreman, Valnoski, to Arnold, an employee, that petitioner did not want an affiliated union in its plant; by Valnoski's statement to Dillon, an employee, that foolishness like filing charges with the Board would have to stop; and by Valnoski's statements to Meistrell, an employee, concerning the giving of testimony before the Board. That petitioner contributed "unlawful assistance" to the Association in violation of section 8(1) of the Act by Valnoski's expression of preference for an unaffiliated union in petitioner's plant. "At a time when its employees were divided for and against an unaffiliated organization, the respondent's foreman, Valnoski, indirectly but clearly, expressed his preference for an unaffiliated organization. Thereafter, while much of the organization

of an unaffiliated union was taking place in the plant during working hours, the respondent, which has been found to have had knowledge of the activity, took no steps to rebut the natural tendency of the employees to presume therefrom that the respondent favored the formation of an unaffiliated organization. Further assistance was supplied by permitting the posting of notices of the Association's meetings and an anti-union handbill on the respondent's bulletin boards, and by permitting the collection of dues for the Association in the plant during working hours. Then, too, the respondent proceeded to recognize the Association on the basis of a petition which did not designate the Association as bargaining representative, but expressed a preference of the signers for an 'independent labor union.' Although informed 1 day later that the Union also claimed to represent a majority of its employees, the respondent nevertheless carried on contract negotiations with the Association. Finally, within a period of 10 days, and after having had notice of the filing by the Union of charges of domination of the Association, the respondent on September 25, 1942, entered into a contract with the Association. A neutral employer, when faced with the conflicting representation claims of two rival unions, would not negotiate a contract with one of them until its right to be recognized as the collective bargaining representative had been finally determined under the procedures set up under the Act."

Petitioner contends (1) that there was nothing in the remarks to Arnold, Dillon or Meistrell which constituted an unfair labor practice; that the statements could not be considered coercive inasmuch as the employees were not prevented from remaining members of or subsequently joining the American Federation of Labor Union; that certain of the statements could not be considered coercive since made subsequent to the organization of the Association and the signing of the contract; and that Valnoski's remarks were constitutionally privileged; (2) that there was no evidence that petitioner knew of the circulation of the petition or that it permitted the collection of Association dues, or the posting of the notices of the Association meetings and the anti-union handbill on its bulletin board; (3) that there is no basis for the conclusion of the Board that the signed petition did not designate

the Association to represent the signers; (4) that there was no evidence to support the conclusion that a neutral employer would not have recognized the Association under the circumstances, and that there is no evidence to support the conclusion that petitioner by signing the one-year contract of September 25, 1942, bestowed unlawful support upon the Association.

Referring briefly to the background of the events relative to the filing of the charges with the Board in this proceeding, it appears that: Petitioner is a New Jersey corporation engaged in the manufacture of mechanical stop-nuts and maintains its home plant in Union, New Jersey. In the summer of 1942 it acquired a large warehouse in Lincoln, Nebraska, and began remodelling it for the purpose of setting up a second plant. Petitioner sent three employees to Lincoln from the New Jersey plant, Hofman, plant manager; Harvin, plant superintendent; and Valnoski, foreman of the automatic screw machine department. Shortly thereafter six automatic screw machines were brought to the Lincoln plant so that men locally employed might be trained in their use and subsequently serve as instructors to new employees as additional equipment was installed.

In July, 1942, and early in August, 1942, the trainee employees began discussing the relative merits of affiliated and unaffiliated unions with a view to the formation of a labor organization which would act as their bargaining agent. There was a divergence of opinion and organizational activities were conducted independently by the supporters of an unaffiliated union on one hand and by those in favor of an affiliated one on the other. In the latter part of August, Borner, an employee favoring an unaffiliated union, began circulating a petition in the plant on behalf of such an organization and eventually secured forty four signers out of the approximately sixty persons employed. Two employees later had their names stricken off.

On September 6th or 7th a group of about nine employees favoring an unaffiliated organization retained Attorney Victor Eitel to draw up articles of incorporation for an independent union (the Association). On September 14th, Eitel called Hofman and requested that petitioner enter into a contract with the Association. Hofman asked for proof of majority representation, and on September

15th Eitel met with Hofman and submitted the petition containing the signatures of the forty-two employees. The signatures were checked against petitioner's payroll, and Hofman, on the advice of petitioner's attorney, stated to Eitel that petitioner was required to recognize the Association as representing a majority of the employees. The Association, that evening, instructed Eitel to prepare a contract for negotiation with petitioner and appointed a negotiating committee.

On September 23d, petitioner agreed on all the terms of the contract with the Association, but refused to sign the contract until the Association could make a showing of majority by paid membership record. Petitioner signed a contract with the Association on September 25th, although Hofman was aware that the affiliated union had filed charges against the petitioner, alleging domination of the Association, on the previous day.

During this same period the employees advocating affiliation were proceeding with organizational activities. They communicated with an official of the American Federation of Labor and asked for assistance. Ray Roth, an international representative of the American Federation of Labor, began holding meetings and securing signatures of employees on union designation cards. After his first meeting with petitioner's employees on September 15th, Roth notified Hofman on September 16th that petitioner's employees had designated him to represent them as their collective bargaining agent, and Hofman agreed to see him on September 18th. On September 18th Roth met with Hofman, declined to reveal the names of the employees of the union he represented, but offered to submit them to the Board. Hofman stated that this was Roth's "privilege" and further stated that he had already recognized a union as required by law. On October 22, 1942, Hofman dismissed Roth's request for recognition of the affiliated union with the statement that petitioner had already signed a contract.

1. In the latter part of August, 1942, Arnold and several other employees approached Valnoski in the plant for the purpose of seeking advice on the subject of unionization. Arnold asked Valnoski what kind of union petitioner had in its New Jersey plant. Valnoski replied that petitioner had an independent organization, and being unwilling to further discuss the subject of unions, walked away. Arnold followed him, and at a time when the two were alone, exhibited an A. F. of L. union card and again questioned Valnoski about the union in the New Jersey plant. Arnold testified with respect to the statement in question that: "He [Valnoski] said they had a company union back in New Jersey, or an independent union back in New Jersey, and if the employees there weren't satisfied they would get into either the C. I. O. or the A. F. of L., and he stated they didn't want any A. F. of L. or C. I. O. here because they couldn't transfer from one department to the other."

We do not sustain petitioner's contention that the statement "contains nothing improper * * * and instead of interfering with the formation of, or contributing any support to, the Association * * · * expressed the freedom of the employees to join any organization they wished." Nor do we agree that the statement "was a mere isolated expression by a department foreman of his individual views, not authorized by his employer, nor of such character as to justify the conclusion that it was expressive of petitioner's policy."

In reaching its conclusion, the Board was entitled to view the incident or statement not as an isolated incident or statement, but with due appreciation of its significance as part of a series of connected and related events which together gave a fair picture of the situation at the Lincoln plant and permitted a more accurate interpretation. Onan v. National Labor Relations Board, 8 Cir., 139 F.2d 728; Canyon Corp. v. National Labor Relations Board, 8 Cir., 128 F.2d 953.

Petitioner was in the process of establishing a new plant in which the selection of a union as a bargaining agent was progressing steadily from discussion as to the merits of an affilated union over an independent organization, and vice versa, to more concrete evidences of support of one or the other in the form of sponsorship of rival organizations. At a time when the rival organizations were still in a formative state, with opinion still divided and no definite decision reached as to which organization should be chosen, the employees were sensitive to weight thrown by their employer in favor of one organization as against another, even though the suggestion of preference be subtle or slight. Cf. National Labor Rela-

tions Board v. Faultless Caster Corp., 7 Cir., 135 F.2d 559, 561;[1] International Ass'n of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 598, 61 S.Ct. 358, 85 L.Ed. 368; Humble Oil Co. v. National Labor Relations Board, 5 Cir., 140 F.2d 777, 779.[2] Under the statute it was the duty of petitioner to refrain from intrusion or interference since the question of choosing an organization for the purpose of collective bargaining was the exclusive concern and business of the employees. National Labor Relations Board v. William Davies Co., 7 Cir., 135 F. 2d 179, 181, certiorari denied, 320 U.S. 770, 64 S.Ct. 82, 88 L.Ed. ——; National Labor Relations Board v. Aluminum Products Co., 7 Cir., 120 F.2d 567, 571; National Labor Relations Board v. Security, Etc., Co., 9 Cir., 136 F.2d 829; Rapid Roller Co. v. National Labor Relations Board, 7 Cir., 126 F.2d 452, 457, certiorari denied, 317 U.S. 650, 63 S.Ct. 45, 87 L.Ed. 523. The Board had before it a record presenting evidence from which the Board could infer, and find as a fact, a studied hostility toward the Union and an exhibited preference for the Association, and that the remark of Valnoski was a step in a continuous course of conduct designed to interfere with the employees in their right of self organization under the Act. The circulation of a petition and procurement of signatures on behalf of the Association during working hours in the plant, the collection of Association dues during working hours in the plant, the posting of notices of Association meetings on petitioner's bulletin board, the posting of an anti-Union handbill on the bulletin board, the prompt recognition of the Association as bargaining agent for the majority of the employees, and on the basis of a petition which did not specifically designate the Association as the representative of the signers, the carrying on of contract negotiations with the As-

sociation while the Union was insisting upon recognition, and the signing of a contract with the Association 10 days after its recognition and one day after notice of the filing of charges that the Association was company-dominated, were all matters to be weighed by the Board. This was a new plant employing workers as yet unsettled in their labor relations, and Valnoski's remark was patently significant in its tendency to affect the organization of the employees. The Board was within its rights in concluding under the evidence that the petitioner had interfered with, restrained and coerced its employees in the exercise of rights guaranteed under section 7 of the Act. Cf. Utah Copper Co. v. National Labor Relations Board, 10 Cir., 139 F.2d 788; National Labor Relations Board v. Pick Mfg. Co., 7 Cir., 135 F.2d 329; National Labor Relations Board v. Security, Etc., Co., 9 Cir., 136 F.2d 829; National Labor Relations Board v. Faultless Caster Co., supra; H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309.

Valnoski's statements to Dillon were made in late November or early December, 1942, while Dillon was in Valnoski's office, at the foreman's request, to discuss some "bad material" Dillon was "supposed to have run." Dillon testified that after a discussion of the bad material, Valnoski "told me the horseplay would have to be cut out around the building there, and that foolishness of trying to file charges like on this John Sothan would have to be stopped." Petitioner argues that no interference with or coercion of the employees could be inferred from the statement because it did not mention any union, was confused and made in a conversation addressed to the subject of defective materials run by Dillon and was made privately to Dillon. We do not sustain the contentions. The Board could infer that the statement contained an implication that employees who resorted to

---

[1] "It may be well to state here once again that the employee must be free from all restraint and coercion, and that the National Labor Relations Act imposes upon an employer total and complete impartiality and the utmost of honest neutrality, since even slight suggestions as to the employer's choice between an outside or inside union may have telling effect and constitute powerful support." National Labor Relations Board v. Faultless Caster Corp., supra.

[2] "It is well recognized that this coercive conduct of supervisory employees possessing such power, particularly when timed to occur during a formative period, may exert a profound influence upon and interfere with the free exercise by the employees of their right to choose a bargaining representative." Humble Oil Co. v. National Labor Relations Board, supra.

the remedies provided by the Act would be subjected to economic reprisals, and that the statement, when considered in connection with other statements and conduct of Valnoski, tended to show an unfair labor practice. See American Pearl Button Co., 52 N.L.R.B. No. 185. That the statement was made privately is immaterial.

■ The Board found that Valnoski stated to Meistrell on the day prior to the beginning of the hearing before the examiner in this case, "I hear you fellows are going to tell a lot of stuff about me up there. You hadn't better or its going to be too bad." It further found that on the fourth day of the hearing Valnoski told Meistrell that, "You know what I told you if you went up there and lied about me." The Board found that Valnoski's first statement was made for the purpose of restraining Meistrell from testifying concerning Valnoski's anti-Union activity and constituted a threat of reprisal if Meistrell so testified; and that the second statement constituted a threat of reprisal against Meistrell for testifying adversely. Petitioner does not contend that Valnoski was not, as the Board found, a supervisory employee for whose conduct petitioner was responsible, but again asserts, as it did with respect to the foreman's statements to Arnold, that the first statement was "a mere isolated expression by Valnoski of his own views in a personal conversation with Meistrell, not authorized by petitioner and not of such a character, nor made under such circumstances, as to justify the conclusion that it was [an expression] of its policy." Our discussion above relating to the remarks of Valnoski to Arnold is here applicable, and on the same reasoning we are precluded from upsetting the Board's conclusion. A statement, although isolated, which, considered in connection with other circumstances, indicates a course of conduct fairly representative of the company's attitude, may be the basis for a finding of unfair labor practices. Boeing Airplane Co. v. National Labor Relations Board, 10 Cir., 140 F.2d 423, 434, see National Labor Relations Board v. Southern Bell Co., 319 U.S. 50, 58, 63 S.Ct. 905, 87 L.Ed. 1250.

■ We may not disregard the statement on the ground that it was equally susceptible to the construction that it was a mere admonition to tell the truth, as petitioner urges. Assuming two inferences were possible, the Board was free to draw one of them. National Labor Relations Board v. Harbison-Walker Co., 8 Cir., 135 F.2d 837, 839; Onan v. National Labor Relations Board, 8 Cir., 139 F.2d 728; National Labor Relations Board v. Central Steel Tube Co., 8 Cir., 139 F.2d 489; National Labor Relations Board v. Nevada Cons. Copper Co., 316 U.S. 105, 106, 62 S. Ct. 960, 86 L.Ed. 1305; National Labor Relations Board v. Precision Casting Co., 6 Cir., 130 F.2d 639, 643; National Labor Relations Board v. Martin Bros. Box Co., 7 Cir., 130 F.2d 202, 205, certiorari denied, 317 U.S. 660, 63 S.Ct. 59, 87 L.Ed. 531.

■ The evidence similarly supports the conclusion that the second of the statements made to Meistrell constituted a threat of reprisal. See Star & Crescent Boat Co., 18 N.L.R.B. No. 68.

■ The fact that the employees to whom Valnoski's remarks were addressed were not deterred from remaining members of, or joining, an A. F. of L. union did not preclude a finding of coercion. Where the conduct was coercive, as found here, it is not necessary to show that the coercive conduct had its desired or intended effect. The remedy furnished by the Act is available whether coercion succeeds or fails. National Labor Relations Board v. Crown Can Co., 8 Cir., 138 F.2d 263, 267; National Labor Relations·Board v. Link-Belt Co., supra; Western Cartridge Co. v. National Labor Relations Board, 7 Cir., 134 F.2d 240, 244, certiorari denied, 320 U.S. 746, 64 S.Ct. 48; National Labor Relations Board v. John Engelhorn & Sons, 3 Cir., 134 F.2d 553, 556; Humble Oil & Refining Co. v. National Labor Relations Board, 5 Cir., 113 F.2d 85, 92; National Labor Relations Board v. Trojan Powder Co., 3 Cir., 135 F.2d 337, 339, certiorari denied, 320 U.S. 768, 64 S.Ct. 76, rehearing denied, 320 U.S. 813, 64 S.Ct. 194; Rapid Roller Co. v. National Labor Relations Board, supra. We note in National Labor Rel. Board v. Mathieson Alkali Works, 4 Cir., 114 F.2d 796, at page 802, cited by petitioner in support of its argument, that the court points out:

"If there were evidence that these foremen were speaking with the authority of [the] respondent, or if their expressions of sentiment were so numerous or of such a character as to justify the inference that they were made with respondent's approval in furtherance of an anti-union policy, an order directing respondent to cease and desist from interfering with its employees in the exercise of the rights guaranteed by

sec. 7 of the Act would be proper, even though it should not appear that anyone's affiliation had been changed thereby; for each employee has the right to be let alone in this respect by the employer and his representatives."

Nor is the fact that the statements were made subsequent to the establishment of the Association as bargaining representative and the execution of a bargaining contract with it conclusive against the findings of the Board. The Board inferred from the evidence that the employees did not freely select the Association as their bargaining representative, and that the contract was not a contract negotiated for them by their freely chosen representative. In those circumstances there had been no settling of labor relations; the employees were still attending organizational activities and attempting to decide on their union affiliations. Since recognition was accorded to an "assisted" union, and the contract entered into with the assisted union, both the recognition and contract may be regarded as ineffective to settle the collective bargaining matters in issue at petitioner's plant. The situation may be viewed as if no bargaining agent had been established and no contract signed. Cf. National Labor Relations Board v. Electric Vacuum Cleaner Co., 315 U.S. 685, 694, 695, 62 S.Ct. 846, 86 L.Ed. 1120. Even if we assume, as is not the case, that the employees had been unhampered in their choice, the right of collective bargaining is a continuing right. As pointed out in National Labor Relations Board v. Newark Morning Ledger, 3 Cir., 120 F.2d 262, 267, 137 A.L.R. 849, certiorari denied, 314 U.S. 693, 62 S.Ct. 363, 86 L.Ed. 554:

"It may at any time become desirable or indeed necessary to bargain collectively for the modification of an existing collective agreement which has proved in practice to be in some respects unfair or unworkable or for the adjustment of complaints or alleged violations of such an agreement. Collective bargaining is thus seen to be a continuing and developing process by which, as the law now recognizes, the relationship between employer and employee is to be molded and the terms and conditions of employment progressively modified along lines which are mutually satisfactory to all concerned. It is not a detached or isolated procedure which, once reflected in a written agreement, becomes a final or permanent result. Section 7, as we have seen, guarantees to employees the right to organize and engage in concerted activities for the purpose of collective bargaining. This right must necessarily continue so long as the prospect of future bargaining remains. It will thus be seen that the act guarantees to employees the continuous right to maintain labor organizations for the purpose of collective bargaining, after the signing of a particular collective bargaining agreement as well as before."

The Board's findings have substantial support upon the evidence.

As to petitioner's argument concerning constitutional privilege. Valnoski's remarks related to petitioner's determination to establish the kind of labor organization it desired—an independent organization, and while an expression of opinion on labor matters may be protected when such utterances do not constitute coercion under the Act, speech amounting, in connection with other circumstances, to coercion within the meaning of the Act is not protected. National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; National Labor Relations Board v. Pick Mfg. Co., 7 Cir., 135 F.2d 329, 331; National Labor Relations Board v. American Tube Bending Co., 2 Cir., 134 F.2d 993, 994, 146 A.L.R. 1017, certiorari denied, 320 U.S. 768, 64 S.Ct. 84; National Labor Relations Board v. Schaefer-Hitchcock Co., 9 Cir., 131 F.2d 1004, 1007; National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 786, certiorari denied, 312 U.S. 678, 61 S.Ct. 447, 85 L.Ed. 1118; Jacksonville Paper Co. v. National Labor Relations Board, 5 Cir., 137 F.2d 148, 152, certiorari denied, 320 U.S. 772, 64 S.Ct. 84. The determination of the category into which the remarks fell was a question of fact for the Board, National Labor Relations Board v. Virginia Power & Electric Co., supra, and the Board's finding on the fact may not be disturbed.

2. Petitioner argues that there was no evidence that petitioner had knowledge of the circulation of the petition in the plant during working hours, or knowingly permitted the collection of dues or the posting of the notices in question. It is clear from the evidence that the petition was circulated and signatures were obtained in the plant during a period of more than two weeks. That 44 out of approxi-

379

mately 60 employees signed the petition and that Valnoski was there present in the plant and overseeing the workmen and performing duties as foreman during that period. In view of the probability of Valnoski's knowledge of the circulation, and the extent of the circulation, the Board was not compelled to accept his bald denial of such knowledge. "The Board, not the court, determines the credibility of the witnesses." National Labor Relations Board v. Crown Can Co., 8 Cir., 138 F.2d 263, 267; National Labor Relations Board v. Aluminum Products Co., supra; National Labor Relations Board v. Security Warehouse & C. S. Co., 9 Cir., 136 F.2d 829, 834; National Labor Relations Board v. Nevada Copper Co., 316 U.S. 105, 106, 62 S.Ct. 960, 86 L.Ed. 1305; Greenport Basin & Const. Co. v. National Labor Relations Board, 2 Cir., 132 F.2d 857. Moreover, Valnoski, in a signed statement to the Board's attorney, stated that he was aware of the circulation of the petition. The Board was entitled to disbelieve his explanation to the effect that he was referring to knowledge gained subsequently. While, as petitioner contends, the signed statement may not amount to affirmative evidence, the inquiry of the Board was directed to the question whether Valnoski knew of the circulation of the petition, and such statement, taken together with the fact of his presence in the plant while the petition was in circulation and the procurement of the signatures thereon, justified the finding of the Board that petitioner had knowledge of the fact of its circulation. The evidence further shows that a number of employees were approached for the purposes of collecting Association dues in the plant during working hours; that the Association notices of meetings were posted on the bulletin board; that a handbill hostile to the Union was posted on and remained on the bulletin board for about two days; and that the bulletin board was about 50 feet from Valnoski's office. While no witness testified directly that the company's attention was expressly called to these activities, it can not be held that the Board's inference that petitioner knew of and permitted them was unreasonable or unsupported. Cf. National Labor Relations Board v. Abbott Worsted Mills, Inc., 1 Cir., 127 F.2d 438, 440. An employer may be "conveniently unaware" of activities which he does not openly endorse. American Smelting & Refining Co. v. National Labor Relations Board, 5 Cir., 128

F.2d 345, 346. It is the province of the Board to draw inferences from the facts, appraise conflicting and circumstantial evidence and determine the weight and credibility of testimony. National Labor Relations Board v. Link-Belt Co., supra; National Labor Relations Board v. Schaefer-Hitchcock, supra; Boeing Airplane Co. v. National Labor Relations Board, supra; F. W. Woolworth Co. v. National Labor Relations Board, 2 Cir., 121 F.2d 658, 660. The fact that the handbill was posted on the bulletin board subsequent to the organization of the Association and the execution of the contract does not militate against the finding of the Board, as we pointed out above with respect to a similar argument of petitioner concerning Valnoski's remarks.

█ 3. Petitioner challenges the finding of the Board that the Association was recognized on the basis of a petition which did not designate the Association as bargaining representative of the employees whose signatures appeared thereon. But the petition on its face supports this finding of the Board. It was headed:

"I am in favor of establishing an Independent Labor Union for the employees of the Elastic Stop Nut Corporation of Lincoln, Nebr.

"This Union will be for the purpose of negotiating with the management for the purpose of securing bargaining rights and to settle all labor disputes that may arise between the company and the employees."

There is nothing in the petition which indicates that the Association had been designated as bargaining representative of the employees. Cf. National Labor Relations Board v. Premo Pharmaceutical Lab., 2 Cir., 136 F.2d 85, 86.

█ 4. The Board found that a neutral employer would not have concluded the contract under the circumstances, and that the employer by signing the contract rendered unlawful assistance to the Association. As has been pointed out, this was a new plant in which the working staff was in process of formation and in which labor policies and convictions were still unsettled, and the Board was not required to disregard that situation in its appraisal of the effects of the expressions of employer preference. During the period of contract negotiation the Union had not ceased its organizational activity and was

demanding recognition. Under the Act the employer is obligated to maintain a total, complete and honest neutrality. National Labor Relations Board v. Faultless Caster Corp., supra; International Ass'n of Machinists v. National Labor Relations Board, supra; National Labor Relations Board v. Link-Belt Co., supra. Petitioner, prior to the period of its contract negotiation, had shown its intention to swing its weight on the side of the Association, and it could not have been unaware of the advantage given the Association by signing a contract with that organization. See National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 267, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. The Board could find such an act, during a period of rivalry between competing unions, and under the circumstances, to be reasonably calculated to indicate the company's preference and to be a violation of the obligation of neutrality.

The Board did not believe that the character and extent of petitioner's activities under the circumstances of the case justified a finding that petitioner violated section 8(2) of the Act, and therefore dismissed the allegations laid under section 8(2) of the complaint. It nevertheless ordered petitioner to cease and desist from recognizing the Association as bargaining agent, and affirmatively to withhold recognition, until and unless the Association was certified by the Board as the proper representative, for the reason that the employees were not given complete freedom to choose between the rival organizations and since the contract of September 25, 1942, would perpetuate petitioner's unlawful assistance to the Association. The immediate object of a proceeding before the Board is to prevent unfair labor practices which tend to thwart the policy of the Act by interfering with the freedom of the employees to designate bargaining representatives of their own choice. Under sec. 10(c) of the Act, 29 U.S.C.A. § 160(c), the Board is given authority to take such affirmative remedial action as will effectuate the purpose of the Act, and this extends to the power to take appropriate steps to nullify the effect of the employer's illegal conduct and prevent its enjoyment of any advantage gained thereby, for, unless the effect of the unfair labor practices is completely neutralized, there is no assurance that restraint is no longer present and that freedom of choice is guaranteed. National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 363, 60 S. Ct. 569, 84 L.Ed. 799; International Ass'n of Machinists v. National Labor Relations Board, 311 U.S. 72, 82, 61 S.Ct. 83, 85 L. Ed. 50; Virginia Electric Co. v. National Labor Relations Board, 319 U.S. 533, 541, 63 S.Ct. 1214, 87 L.Ed. 1568; H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 520, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 600, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396; Birmingham Post Co. v. National Labor Relations Board, 5 Cir., 140 F.2d 638, 640. Inasmuch as a broad exercise of the Board's expert judgment, and its discretion, is necessary to effectuate the policy of the Board, it will not be lightly disturbed. Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217; Williams Motor Co. v. National Labor Relations Board, 8 Cir., 128 F.2d 960, 964. "The Board not the courts determines under this statutory scheme how the effect of unfair labor practices may be expunged." National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 600, 61 S. Ct. 358, 366, 85 L.Ed. 368; Williams Motor Co. v. National Labor Relations Board, 8 Cir., 128 F.2d 960, 964; National Labor Relations Board v. Southwestern Greyhound Lines, 8 Cir., 126 F.2d 883, 886; Franks Bros. Co. v. National Labor Relations Board, 64 S.Ct. 817, decided April 10, 1944. We find the Board's order was within its power and reasonably adapted to effectuate the policies of the Act under the circumstances found by it.

Enforcement will be ordered as prayed by the Board.

GARDNER, Circuit Judge, concurs in the result.