Coy Willie **LATHAN**, Appellant,

v.

Curtis **REID**, Appellee.

No. 15672.

United States Court of Appeals District of Columbia Circuit.

June 2, 1960.

Messrs. Richard Arens; Washington, D. C., and Lawrence Speiser, Washing-ton, D. C., were on the pleadings for appellant.

Messrs. Oliver Gasch, U. S. Atty., Carl W. Belcher and Daniel J. McTague, Asst. U. S. Attys., were on the pleadings for appellee.

Before WILBUR K. MILLER, BAZELON and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This is an extradition case. Appellant's counsel urges that appellant is mentally incompetent, that he is unable to assist counsel, and that accordingly he is not subject to being extradited.

It appears that on March 2, 1960, appellant was apprehended in the District of Columbia at the request of the North Carolina authorities, who alleged that he had escaped from custody in that state while serving a sentence of imprisonment for crime, and had fled to this jurisdiction. On being committed to the District of Columbia Jail, appellant requested legal assistance. Counsel was appointed for him. One week later, on March 9, Chief Judge Pine of the District Court, acting as chief executive under the provisions of the governing statute, D.C. Code § 23–401 (Supp. VIII, 1960), held an extradition hearing. A Government psychiatrist, Dr. Berman, testified that he had examined appellant at the direction of the Chief Judge, and had concluded that appellant was mentally competent to understand the pending proceedings and to assist counsel in defending himself. On cross-examination he stated that he was aware of two episodes that same morning on which appellant had attempted to commit suicide in his cell.[1] Dr. Berman said that there were two possibilities, one, that these attempts were a form of malingering in an effort to avoid extradition; the other, that appellant was genuinely fearful of receiving bad treatment in North Carolina and might have wished to kill himself rather

---

1. These episodes were the cause of the Chief Judge's direction to Dr. Berman to make an examination.

than return. At this point appellant interjected:

"You ain't going to kill me. You're tricking me too; I know you're tricking me. I ain't going to let you kill me. It's all set up. This is a set-up. I ain't going to die down there; I'll die here first; yes, I will."

The doctor was then asked whether he thought appellant was competent to assist counsel at the present moment. He replied:

"Well, it doesn't look like he would cooperate at this moment in his defense. But he certainly was—on the basis of the examination that I conducted for an hour he certainly was most cooperative and most pleasant to talk to."

In his further testimony Dr. Berman said that in his opinion appellant was not psychotic, but was fully oriented. He said further that he could not predict appellant's future conduct, although there would be a danger of further attempts at suicide under conditions of strain. At this point, both sides indicated that they had nothing further to offer. Appellant's counsel added that if appellant was not capable of assisting in his own defense, "and if there is some doubt, I think some further check should be made of him prior to any type of hearing which is going to involve his rights." The Chief Judge replied: "I think on the evidence before me there is sufficient to proceed. So, I shall proceed."

The Government thereupon called Officer Rericha of the North Carolina Prison Department, who testified that appellant Lathan was the individual whose extradition was sought; that he had interviewed Lathan after the latter's apprehension in the District of Columbia; and that Lathan had advised him that he had escaped from custody in North Carolina, did not wish to return, and would not waive extradition proceedings. The officer also testified that Lathan had described to him the charge on which he had been tried in North Carolina. The Government, after offering the formal requisition papers, concluded its case. Appellant's counsel, in answer to the Chief Judge's question as to whether he wished to offer any evidence, replied that the defendant had advised him he wished to make a statement. Appellant thereupon addressed the Chief Judge at some length, complaining of the proceedings at his trial in North Carolina and of his treatment while in prison. He expressed fear that he would be killed if he were returned to North Carolina. The statement, though emotional, clearly indicated that appellant was the person sought to be extradited and that he was a fugitive from North Carolina. The Chief Judge asked appellant's counsel whether he had anything further to offer. The reply was in the negative. The Chief Judge then stated that on the evidence before him his only course was to order extradition. He suggested that Officer Rericha attempt to reassure appellant. The officer replied that there was no purpose to mistreat appellant, that the Director of Prisons would not allow any mistreatment, that he would be treated fairly and not be assaulted or killed. The officer indicated that he would request his supervisor to come up to the District of Columbia to offer further reassurance. Chief Judge Pine then signed the extradition order.

Appellant's counsel promptly filed a petition for a writ of habeas corpus. A hearing was held before Judge Youngdahl of the District Court on April 13, 1960. The Government put on the stand a fingerprint expert who testified on the basis of official records that appellant was the same person who had been convicted in North Carolina and who had escaped from confinement there. Appellant's counsel declined to cross-examine the expert, on the ground that counsel was unable to establish effective communication with appellant and accordingly was unable to prepare a defense.[2]

---

2. Appellant at this time was represented by new counsel, who now represent him in this appeal.

Counsel offered to show that appellant was mentally incompetent, and was in fact psychotic. The court, after hearing argument, concluded that he could not go behind the finding of competency made by Chief Judge Pine. He ruled that it had been established that appellant was the person sought, and that he was a fugitive. He denied the petition for habeas corpus. An appeal from the ruling was taken to this court. The Government thereupon moved to dismiss or affirm. We heard argument on the motion, and allowed both sides a reasonable time within which to file further briefs.

 Having in mind the very limited nature and purpose of an extradition hearing before an executive officer, we cannot say from the record here that Chief Judge Pine—sitting in his executive capacity—could not reasonably find that appellant was mentally competent for the purposes of such a hearing. And since the Government's evidence as to identity, fugitivity, and the charge of criminality was clear and complete, we conclude that the extradition order was valid. See Bruzaud v. Matthews, 1953, 93 U.S.App.D.C. 47, 207 F.2d 25. The order having been properly entered, we think Judge Youngdahl correctly denied habeas corpus, even if it be assumed that by the time of the habeas corpus hearing on April 13 appellant's mental condition was such that he could not assist counsel and was in fact psychotic. On the facts here, we do not perceive any possible way

in which appellant, if competent, could have aided counsel in making a tenable showing that appellant was entitled to habeas corpus and his freedom. No suggestion is made that the requisition papers were in any way defective. We see no reason of substance for delaying this appellant's extradition until he has been restored to competency. Perhaps a case of that sort may arise. But it is not this case.

Appellant's counsel urges that the extradition statute in this jurisdiction, D.C.Code § 23–401, supra, requires that the alleged fugitive be given a hearing at which he is competent to assist his counsel, and that if he is incompetent the hearing cannot result in a valid extradition order.[3] The Government controverts this, relying on such cases as Drew v. Thaw, 1914, 235 U.S. 432, 35 S.Ct. 137, 59 L.Ed. 302; Charlton v. Kelly, 1913, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274; State ex rel. Davey v. Owen, 1937, 133 Ohio St. 96, 12 N.E.2d 144, 114 A.L.R. 686, and Brewer v. Turner, 1948, 165 Kan. 330, 194 P.2d 507. We need not, however, reach these contentions in this case. We think it clear that in any event appellant's first hearing adequately grounded the extradition order

 Counsel also urges that to return appellant to North Carolina in his present condition would be cruel and unusual punishment. We must reject this argument.[4] We must assume that the

---

3. The governing statute provides in pertinent part:

"(a) In all cases where the laws of the United States provide that fugitives from justice shall be delivered up, the Chief Justice of the District Court of the United States for the District of Columbia shall cause to be apprehended and delivered up such fugitive from justice who shall be found within the District, in the same manner and under the same regulations as the executive authorities of the several States are required to do * * *.

 * * * * *

"(c) No person apprehended in accordance with the provisions of subsections (a) and (b) of this section shall be de-

livered over to the agent whom the executive authority demanding him shall have appointed to receive him unless he shall first be taken before the chief judge of the United States District Court for the District of Columbia who shall inform him of the demand made for his surrender, and of the crime with which he is charged, and that he has the right to demand and procure legal counsel; and if such person or his counsel shall state that he or they desire to test the legality of his arrest, the judge shall fix a reasonable time to be allowed him within which to apply for a writ of habeas corpus * * *."

4. Although it is not in our record, and forms no part of the basis for our decision,

state and federal courts in North Carolina are available to appellant, and will give due consideration to any request for relief he may file in them. Cf. Sweeney v. Woodall, 1952, 344 U.S. 86, 73 S.Ct. 139, 97 L.Ed. 114.

The denial of habeas corpus will be Affirmed.

we think we should note—in fairness to the North Carolina prison authorities—that they have formally advised the United States Attorney in this jurisdiction that if and when appellant is returned to them "he would be screened by our psychiatrist and if necessary confined to a State Hospital for treatment."