NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

Aaron TROSCH, Ivan E. Trosch and Melvin R. Trosch, d/b/a Maryland News Company, Respondent.

No. 8894.

United States Court of Appeals Fourth Circuit.

Argued June 12, 1963.

Decided Aug. 19, 1963.

Arthur M. Goldberg, Atty., National Labor Relations Board (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., Atty., National Labor Relations Board, on brief), for petitioner.

James J. Doherty (Friedman & Goodman on brief), for respondent.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

The National Labor Relations Board, pursuant to section 10(e) of the National Labor Relations Act, as amended (herein called the Act),[1] seeks enforcement of its order against Aaron Trosch, Ivan E. Trosch and Melvin R. Trosch, doing business as Maryland News Company (herein referred to jointly as Maryland News). The charge of unfair labor practices was originally filed on October 26, 1961, by Warehouse, Retail and Mail Order Employees Local Union No. 590 (herein referred to as Local 590), affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and the complaint was issued December 15, 1961.

A hearing was held before a Trial Examiner who, in findings, conclusions and recommendations which were adopted by the Board,[2] held that Maryland News interfered with employees' rights in violation of section 8(a) (1), (2) and (3) of the Act.[3]

Maryland News, a partnership with its office, warehouse and place of business in Baltimore, Maryland, is engaged in the wholesale distribution of magazines, books, periodicals and newspapers in commerce within the meaning of section 2(6) of the Act.[4] Both Local 590 and the Maryland News Employees Association, later herein to be mentioned, are labor organizations within the meaning of section 2(5) of the Act[5] and no jurisdictional issue is presented. The sole question before this court is whether there is substantial evidence in the record as a whole to support the Board's findings. We think the Board's order must be enforced.

On January 6, 1961, Local 590 filed with the Board a petition asking to represent a unit of 30 Maryland News employees. At a hearing on that petition, Maryland News contended that the appropriate unit should include 60 of its employees. Local 590 withdrew its first petition on January 30, 1961, and on

1. 29 U.S.C.A. §§ 151 et seq., 61 Stat. 136 (1947), 73 Stat. 541 (1959). Section 10(e) is 29 U.S.C.A. § 160(e), 61 Stat. 147 (1947), 72 Stat. 945 (1958).

2. The Board's Decision and Order, issued August 23, 1962, are reported at 138 N.L.R.B. No. 28.

3. 29 U.S.C.A. § 158(a) (1), (2) and (3) in pertinent part read as follows:
"§ 158. Unfair labor practices
"(a) It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; * * *
"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor or-

ganization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made * * *." 61 Stat. 140 (1947), 65 Stat. 601 (1951), 73 Stat. 525 (1959).

4. 29 U.S.C.A. § 152(6), 61 Stat. 138 (1947).

5. 29 U.S.C.A. § 152(5), 61 Stat. 138 (1947).

February 1, 1961, filed a second petition seeking a unit of 32 employees, different from the unit first requested. At a hearing on the second petition, February 27, 1961, Maryland News again denied the appropriateness of the unit sought by Local 590 and claimed it was impossible to carve out a unit of 30 or 32 from the over-all group of 60 employees. The question of the appropriate unit for purposes of collective bargaining was still unresolved and pending before the Board on the date of the Trial Examiner's hearing in the unfair labor practice proceedings here under review. The delay was occasioned by application of Board policy whereby proceedings on a Petition for Certification of Representatives are suspended during the pendency of unfair labor practice charges.

Beginning February 28, 1961, and continuing until March 3, 1961, Local 590 picketed the premises of Maryland News. There was testimony that no Maryland News employee respected the picket line. During the picketing, Philip Appel, an employee of Maryland News, prepared and circulated among the employees a document reading, "We the undersigned, including those who have signed Union Cards and those who have not signed Union Cards, hereby withdraw our Membership and demand that the picket line at Maryland News Company be removed." Approximately 53 employees signed this document and, shortly thereafter, Appel gave a copy thereof to Melvin R. Trosch (herein referred to as Trosch), one of the partners and then general manager of Maryland News. Trosch testified that he received a copy of the document in February 1961. Appel testified that he also gave copies to representatives of Local 590. While picketing was still in progress, Appel, together with other employees, went to Local 590's office and requested return of their Union Cards. On one such visit Appel was accompanied by James A. Ostendorf, an attorney. Local 590 at all times refused to return the cards.

Appel talked to some fellow employees about organizing an independent group to represent the employees. On or about May 15, 1961, a group of employees, deciding they were tired of waiting for a ruling on the petition of Local 590, met after working hours with attorney Ostendorf and, by majority vote, formed the Maryland News Employees Association (hereinafter referred to as Association) and elected T. M. Wallace chairman. Wallace estimated that eighteen were present at the meeting and Appel said there were thirty. At the request of Wallace, Ostendorf drafted a proposed contract embodying the demands of the employees. Toward the end of May a committee of five, including Wallace and Appel, presented this draft to Trosch and discussed its terms with him. The committee and Trosch held several other meetings and, finally, at a meeting on June 5 or 6, 1961, Trosch presented them with a draft of a contract prepared by him. The Association committee assured Trosch verbally that it represented a majority of the employees and referred him to the employees' petition signed during the picketing at the end of February. Although the committee had no written authorization from the employees to act as their representative for purposes of collective bargaining, Trosch presumed the Association represented a majority, recognized it as exclusive collective bargaining representative, and bargained with the committee without demanding further proof of authorization by the employees. At Trosch's request, the draft contract was circulated among the employees for their approval and was signed by fifty-three of them. Trosch signed the contract for Maryland News, but no one remembered whether his signature was placed on the contract before or after its circulation among the employees. The contract, by its terms effective June 7, 1961, provided that the Association would be the exclusive bargaining agent for all employees in the unit of sixty originally proposed by Maryland News, recognized the pendency of Board proceedings, and required all employees to become and re-

main members of the Association after thirty days' employment, but there was no provision for thirty days' grace for those employees who had not joined the Association on the effective date of the contract.[6]

In determining that Maryland News had committed § 8(a) (2) and § 8(a) (1) violations by recognizing the Association, bargaining and entering into an exclusive collective bargaining agreement with it, the Board, through its Trial Examiner, credited Wallace's testimony over that of Appel in finding that only eighteen employees had attended the organizational meeting of the Association on May 15, 1961. The Examiner and the Board ruled that the petition signed by the employees during the February picketing, two months prior to the formation of the Association, had no probative value with respect to the Association's claim of representation. The testimony as to whether other employees joined with the group of eighteen was found to be too vague to permit drawing an inference that the Association did obtain authorization to represent a majority of the employees. It was determined that the signing of the final contract by a majority of Maryland News employees was not relevant under circumstances where it had never been shown that a majority of the employees covered by the agreement had authorized the Association to bargain for them.

■ Even though, under the circumstances here revealed, we are in sympathy with the efforts of Maryland News and its employees to settle outstanding questions between them by negotiating, drafting and executing a labor agreement, and although nothing in the record indicates company domination of the Association, we cannot say that the Board was not warranted in concluding that the evidence failed to prove that the Association represented a majority of the employees covered by the agreement. The Board, in the exercise of its functions as finder of fact, resolved the conflicts in the testimony and determined the inferences to be drawn from the evidence. We find no error in its decision on these points. Under the standard of review established by Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we are of the opinion that there is substantial evidence in the record as a whole to support the Board's finding that at the time Maryland News recognized, bargained with, and entered into an exclusive collective bargaining agreement with, the Association, the Association was not the representative of a majority of the employees covered by that agreement. Therefore, the case clearly falls under the holding in International Ladies' Garment Workers Union v. N. L. R. B., 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed. 2d 762 (1961).

■ In Garment Workers a union and an employer had entered into a memorandum agreement by which the employer recognized the union as the exclusive bargaining representative of certain of his employees at a time when only a

---

6. The relevant portions of the contract read as follows:
   "1. The Union [the Association] shall be the exclusive bargaining agent for all the employees covered by this Agreement. It is the intent of the parties hereto that the within Agreement shall be intended to cover all conditions of employment, between the Company [Maryland News] and the Union [the Association].
   *    *    *    *    *
   "7. Employees covered—All employees of the Company except * * * [certain named individuals, positions previously held by named employees, and cas-

ual employees not on the regular payroll].
   *    *    *    *    *
   "11. Because of the pendency of the National Labor Relations Board proceedings instituted by the Warehouse Union [Local 590], the Company recognizes that certain inequities in wage rates exist as of the date of this Contract. * * *
   *    *    *    *    *
   "18. After 30 days employment, all employees covered by this Contract shall become members of the Union [the Association] and remain members in good standing during the period this Agreement remains in effect."

minority of the employees in the unit supported the union. Six weeks later, when the memorandum matured into a formal collective bargaining agreement, the union in fact represented a majority of the employees. The Court held that this later-acquired majority representation was not of controlling significance; that the earlier recognition of the minority union was an accomplished fact upon the signing of the memorandum and had deprived the majority of their right to choose their own representative; that the agreement was void in its entirety and was unenforceable even as to consenting employees; that the employer's recognition of the union constituted unlawful support of it, in violation of § 8 (a) (2) and § 8(a) (1); and that the prohibited conduct was not excused by any showing of good faith. Consequently, the Board's order to discontinue the unfair labor practices and to conduct an election was held to provide an appropriate remedy.

■ Here, under the Board's findings, Maryland News recognized a minority union and negotiated a labor agreement with it. The facts that the employer's actions were taken in good faith and that a majority of the employees later signed the final version of the agreement do not help Maryland News. In International Ladies' Garment Workers Union v. N. L. R. B., 366 U.S. at 739, 81 S.Ct. at 1608, 6 L.Ed.2d 762, the Court, in holding that good faith was no defense, said this:

"* * * We find nothing in the statutory language prescribing *scienter* as an element of the unfair labor practices here involved. The act made unlawful by § 8(a) (2) is employer support of a minority union. Here that support is an accomplished fact. More need not be shown, for, even if mistakenly, the employees' rights have been invaded. It follows that prohibited conduct cannot be excused by a showing of good faith."

The Court then discussed the employer's duty to take reasonable steps to verify the representation claims of a union with which it proposes to negotiate a collective bargaining agreement:

"* * * If an employer takes reasonable steps to verify union claims, * * * he can readily ascertain their validity and obviate a Board election. We fail to see any onerous burden involved in requiring responsible negotiators to be careful, by cross-checking, for example, well-analyzed employer records with union listings or authorization cards. Individual and collective employee rights may not be trampled upon merely because it is inconvenient to avoid doing so." 366 U.S. at 739–740, 81 S.Ct. at 1608–1609, 6 L.Ed.2d 762.

The evidence is uncontradicted that Maryland News made no effort to verify the Association's claims of majority support prior to entering into negotiations and drafting a contract. There would seem to be no question that merely by recognizing a minority union and negotiating a labor agreement with it, Marylan News violated § 8(a) (2) and § 8(a) (1).

■ The Board found that Local 590 had never withdrawn its second petition or abandoned its claims of representation and that Maryland News was aware of the pendency of questions before the Board as to the appropriate unit and the representation of its employees. Applying its Midwest Piping doctrine,[7] the Board based its determination that Maryland News was in violation of § 8(a) (2) and § 8(a) (1) upon the finding that Maryland News recognized, bargained with and entered into an exclusive bargaining agreement with the Association while a real question of representation was pending. Under the Midwest Piping rule, an employer faced with rival representation claims must maintain a strictly neutral position and cannot aid one of the competing unions by recognizing it.

---

7. This doctrine derives from Midwest Piping & Supply Co., 63 N.L.R.B. 1060 (1945).

See N. L. R. B. v. Signal Oil & Gas Co., 303 F.2d 785 (5th Cir., 1962). An exception in which the employer is obliged to recognize and bargain with one of the unions has been carved out where a real question of representation no longer exists because the employer, without illegal act or pressure, obtains indisputable proof of majority support for one of the competing unions. Such proof has been provided by employee petitions (National Labor Rel. Bd. v. Indianapolis Newspapers, 210 F.2d 501 (7th Cir., 1954)) and a card check by a disinterested arbitrator (District 50, United Mine Workers v. National Labor Rel. Bd., 234 F.2d 565 (4th Cir., 1956)) with the employer verifying the support of a majority of the employees involved by cross-checking the current employment records. Under the Board's findings the proof required to show majority support for the Association was lacking and this case cannot be brought within the exception to the Midwest Piping rule.

Under the Garment Workers case and the Midwest Piping rule, the injury to the employees is the same—abridgment of their right under section 7 of the Act [8] "to bargain collectively through representatives of their own choosing" or "to refrain from" such activity. Such a grant of exclusive recognition to a minority union without verification of its claims of representation constitutes unlawful support in violation of § 8(a) (2) and § 8(a) (1) because a union so favored has "a marked advantage over any other in securing the adherence of employees." N. L. R. B. v. Pennsylvania Greyhound Lines, 303 U.S. 261, 267, 58 S.Ct. 571, 574–575, 82 L.Ed. 831 (1938). Thus, the Board properly rejected proof of later-acquired majority status on the part of the Association. As was noted in Garment Workers, "such acquisition of majority status itself might indicate that the recognition secured by the * * * [earlier] agreement afforded * * * [the minority union] a deceptive cloak of authority with which to persuasively elicit additional employee support." 366 U.S. at 736, 81 S.Ct. at 1606–1607, 6 L.Ed. 2d 762. We, therefore, conclude that the Board is entitled to enforcement of its order requiring Maryland News to withdraw recognition from the Association and cease giving effect to its agreement with the Association unless and until the Association shall have been certified by the Board as the representative of an appropriate unit of the employees, and only then if the agreement otherwise conforms to the provisions of the Act.

■ The union security clause, paragraph 18 of the contract (footnote 6, supra), was found by the Board to be invalid on its face due to its failure to provide the 30-day grace period for "the then employees" required by section 8(a) (3) (footnote 3, supra). In addition, the Board held that execution and maintenance of the contract containing the clause violated section 8(a) (1), (2) and (3) of the Act because it required membership in a minority union as a condition of employment. We agree with these holdings and any future contract should fully conform to the provisions of the Act.

Enforcement granted.

8. 29 U.S.C.A. § 157 provides as follows:
"§ 157. Right of employees as to organization, collective bargaining, etc.
"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title." 61 Stat. 140 (1947).