**IOWA BEEF PACKERS, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17446.

United States Court of Appeals
Eighth Circuit.

April 28, 1964.

Arthur H. Johnson, Fort Dodge, Iowa, made argument and filed brief for petitioner.

Lawrence Joseph, Atty., N. L. R. B., Washington, D. C. made argument for Labor Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., N. L. R. B., Washington, D. C., were with him on brief).

Before VOGEL, MATTHES and BLACKMUN, Circuit Judges.

MATTHES, Circuit Judge.

In this review proceeding the broad question for our determination is whether Iowa Beef Packers, Inc. (hereinafter called "Company") violated §§ 8(a) (2) and 8(a) (4) of the National Labor Relations Act.[1]

The activities and conduct of Company forming the basis for the unfair labor charges and the ultimate order of the Board finding violations of the Act stem in large part from Company's antagonism toward United Packinghouse, Food & Allied Workers Dist. No. 3, AFL-CIO (hereinafter called "International"), and from the efforts of International and Hawkeye Industrial Labor Union (hereinafter called "Independent"), a competing labor organization, to represent Company's employees as their bargaining agent.

A brief résumé of the evidence, largely uncontroverted, will be of assistance and helpful to an understanding of the issues before us.

The Fort Dodge Packing Company, whose employees had been represented by Local 607 of International, discontinued operations in November, 1961. Company purchased the Fort Dodge plant in February, 1962, and thereafter rebuilt it. When the rebuilding of the plant began, there were about 500 applicants for jobs. Company hired approximately 90 of these men with the understanding that those who worked on the construction would be accorded preference in filling the production jobs.

Of the 48 men whom the old Fort Dodge Packing Company had employed in its production unit, 29 applied for employment with Company. Eighteen of these men—all of whom were either members or former officers of Local 607 of International—were hired by Company. Of the 11 who were not employed, 5 were alleged discriminatees and the subject of 8(a) (3) charges.

1. Company filed petition for review seeking to set aside the portions of the Board's order finding violation of 8(a) (2) and requiring Company to hire an alleged discriminatee for violation of 8 (a) (4). The Board has cross-petitioned and seeks enforcement of its entire order, which also includes a violation of 8(a) (1), not directly in issue here.

Company began operations on October 2, 1962. In addition to the 500 men who applied for jobs before construction began, more than 1,000 applied during the course of construction. The total work force for Company's plant when it began production was about 160 employees, and its preannounced plan of hiring men who had worked on construction was carried out.

In early September, 1962, International began an organizational drive among the employees. Meetings were held regularly, and in late September, International handbilled the plant. Company's President A. D. Anderson and Company's supervisors were aware of International's activities. At approximately the same time that production began, a number of Company's employees formed the Independent Union, and then competed with International for support in an effort to become the bargaining agent.

Company also operated a packing plant in Denison, Iowa. At the time of the hearing on the charges filed in this case, the employees of that plant were represented by an independent union. Prior to formation of the independent union, Company—and Mr. Anderson in particular—had encountered difficulty with International during the period that one of its locals was the bargaining agent at the Denison plant.

Mr. Anderson was opposed to International representing his company's employees in the Fort Dodge plant, and he and his supervisors engaged actively in a campaign to discourage the employees from joining or supporting International. This conduct and activity constituted unfair labor practices, and resulted in the 8(a) (1) violations.

During the latter part of October, 1962, the competing labor organizations moved swiftly in their organizational efforts. On October 18, Independent filed with Company a petition containing the signatures of over 100 of the total work force of approximately 160 employees. At the same time, International claimed it represented a majority of the employees. On October 23, International filed a representation petition with the Board, to which were allegedly attached 47 union authorization cards. Nine additional cards were allegedly later filed with the Board of which 5 or 6 were signed subsequent to October 23. Company received notice of the filing of International's representation petition on October 24 or 25, but on October 26 Company recognized Independent as the exclusive bargaining agent. On December 17, 1962, Company and Independent executed a labor contract.

With this background information, we consider the unfair labor charges and subsequent Board proceedings.

Upon separate charges, one filed by a former Fort Dodge Packing Company employee, and one filed by International, the acting regional director of the National Labor Relations Board issued a complaint dated December 17, 1962, alleging that Company had committed unfair labor practices within the meaning of 8(a) (1), (a) (2), (a) (3) and (a) (4).[2] More precisely, the complaint alleged—(1) that Company had interfered with, restrained and coerced its employees, in the exercise of their § 7 rights, by threatening to close the plant if the employees selected International or any other international union to represent them, by creating the impression among

2. §§ 8(a) (1), (a) (2), (a) (3) and (a) (4) provide in pertinent part:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of this title;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; * * *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; * * *

"(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter."

employees that Company was engaging in surveillance of their activities on behalf of International, by threatening employees with discharge for joining International or engaging in activities on behalf of International, by interrogating employees concerning their union membership and activities, and that such conduct and activity was violative of 8(a) (1) of the Act; (2) that since on or about October 26, 1962, Company had rendered and was rendering unlawful aid, assistance and support to Independent in violation of 8(a) (1) and (2) of the Act, by recognizing Independent as the exclusive bargaining agent for all of the employees at Company's plant in Fort Dodge, Iowa, and by engaging in collective bargaining with Independent after International had requested recognition on or about October 17, 1962, and after International had filed a representation petition with the Board on October 23, 1962; (3) that Company had violated 8(a) (1) and (3) of the Act by refusing to hire and employ 5 individuals who were members of International, who had otherwise assisted and supported International, and who had held offices in Local 607 of International while they were employed by the Fort Dodge Packing Company; (4) that Company had violated 8(a) (1), (3) and (4) of the Act by refusing on or about September 28, 1962, to hire and employ one James Grove for the reason that he had filed charges against Company under the Act.

After an extensive hearing the trial examiner filed his intermediate report finding:

(1) Company had engaged in unfair labor practices within the meaning of 8(a) (1); (2) Company had not violated 8(a) (2) and (3) as charged in the complaint; (3) Company had violated 8(a) (4) by refusing to employ James Grove because he filed a charge with the Board.

However, finding further that Grove had deliberately falsified one of the allegations in the charge. Accordingly, the examiner recommended an appropriate remedy for the 8(a) (1) violation, recommended that the 8(a) (2) and (3) charges be dismissed, and recommended that the usual 8(a) (4) remedy ordering Company to hire Grove be withheld.

Upon exceptions filed by the charging party and general counsel, the Board agreed with the examiner's finding that Company had engaged in conduct proscribed by 8(a) (1), and that Company had not violated 8(a) (3). However, contrary to the findings of the examiner, the Board found that by recognizing and executing a collective bargaining agreement with Independent in the face of an existing question concerning representation, Company had granted unlawful assistance and support to Independent in violation of 8(a) (2) and 8(a) (1). Furthermore, while agreeing with the examiner's finding that Company had violated 8(a) (4) in discriminatorily refusing to hire Grove, the Board—contrary to the examiner's recommendation—refused to withhold the usual 8(a) (4) remedy. The Board ordered Company to cease and desist from the alleged unlawful conduct, ordered that certain affirmative action be taken, and ordered that appropriate notices be posted. See 144 N.L.R.B. No. 64.

Inasmuch as Company did not before the Board and does not here challenge the finding that it committed an 8(a) (1) violation, we need not concern ourselves with this phase of the proceeding and will consider the unlawful conduct forming the basis for the 8(a) (1) violation only as such conduct bears upon and is related to the 8(a) (2) charge.[3] Similarly, since the parties aggrieved by the Board's finding that Company did not violate 8(a) (3) do not seek a review of that

3. Under § 10(e) of the Act, 29 U.S.C.A. § 160(e) no objection that has not been urged before the Board shall be considered by the court unless the failure or neglect to urge the objection shall be excused because of extraordinary circumstances. Company does not invoke the "extraordinary circumstances" provision but, to the contrary, concedes, in effect, that the examiner's and the Board's finding of the 8(a) (1) violation is supported by substantial evidence.

portion of the order, we forego further consideration of that finding.

In resolving the issues before us, we are required to heed the mandate of the Act that, "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." § 10(e) of the Act; 29 U.S.C.A. § 160(e). In view of the urgent insistence of Company that the Board fell into error in refusing to adhere to and follow the recommendations of the trial examiner in toto, it may not be amiss to again call attention to the teachings of the landmark case, Universal Camera Corporation v. N. L. R..B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). There the Supreme Court considered the scope of judicial review of the Board's orders— including situations involving disagreement between the findings of the Board as opposed to those of the examiner. The Court stated:

> "The Taft-Hartley Act provides that 'The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.' 61 Stat. 148, 29 U.S.C. (Supp. III) § 160(e). Surely an examiner's report is as much a part of the record as the complaint or the testimony. [340 U.S. at 493, 71 S.Ct. at 467, 95 L.Ed. 456.]

> \* \* \* \* \* \*

> "It is therefore difficult to escape the conclusion that the plain language of the statutes directs a reviewing court to determine the substantiality of evidence on the record including the examiner's report. [Ibid.]

\* \* \* \* \* \*

"We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed the other factors which in sum determine whether evidence is 'substantial.' " Id. at 496–497 of 340 U.S., at 469 of 71 S.Ct., 95 L.Ed. 456.[4]

Turning to the 8(a) (2) violation, we observe that the Board based its decision and order primarily on the so-called Midwest Piping Doctrine enunciated in Midwest Piping & Supply Company, Inc., 63 NLRB 1060 (1945). The Board suggests that the gravamen of this doctrine is "that an employer disrupts the Board's processes and usurps its functions when he resolves for himself, *during the pendency of representation proceedings*, the question of which of the competing unions represents the employees." In our view, while pendency of

4. In applying the Universal Camera doctrine, courts have—depending on the circumstances—granted enforcement of a Board order even though the Board reached conclusions contrary to those of the trial examiner. E. g., Kingsbury Electric Cooperative, Inc. v. N. L. R. B., 8 Cir., 319 F.2d 387, 390 (1963); Pratt & Whitney Aircraft Division, Etc. v. N. L. R. B., 5 Cir., 310 F.2d 676, 678–679 (1962); Warehousemen & Mail Order Emp., Local No. 743 v. N. L. R. B., 112 U.S.App.D.C. 280, 302 F.2d 865, 866, 868–869 (1962). Of course, under other circumstances, courts have refused to grant enforcement and, in effect, have agreed with the examiner rather than the Board. E.g., N. L. R. B. v. Murray Ohio Manufacturing Company, 6 Cir., 326 F.2d 509 (1964).

one union's petition for Board certification may be a prime factor in determining whether an employer violated the Act by recognizing a rival union, it is not ipso facto determinative. Rather, the essence of the doctrine is that an employer violates 8(a)(2) of the Act when he recognizes one of two competing unions as exclusive bargaining agent if, at the time of recognition, the employer had actual or constructive knowledge that a real question concerning the representation of his employees existed. Each case of this type poses this identical question, but its determination is contingent upon the particular facts of each case. N. L. R. B. v. North Electric Company, 6 Cir., 296 F.2d 137, 139 (1961).

The Midwest Piping decision itself relies in part on an Eighth Circuit case—Elastic Stop Nut Corp. v. N. L. R. B., 142 F.2d 371 (1944), cert. denied, 323 U.S. 722, 65 S.Ct. 55, 89 L.Ed. 580 (1944)—and the doctrine has been judicially approved under a variety of factual circumstances. N. L. R. B. v. Trosch, 4 Cir., 321 F.2d 692 (1963) cert. denied, 375 U.S. 993, 84 S.Ct. 632, 11 L.Ed.2d 478 (1964); N. L. R. B. v. Signal Oil and Gas Company, 5 Cir., 303 F.2d 785 (1962); St. Louis Independent Packing Company v. N. L. R. B., 7 Cir., 291 F.2d 700 (1961); and Local 483, Inter. Brotherhood of Boilermakers, etc. v. N. L. R. B., 109 U.S.App.D.C. 382, 288 F.2d 166 (1961), cert. denied, 368 U.S. 832, 82 S. Ct. 55, 7 L.Ed.2d 34 (1961). Compare also, International Ladies' Garment Workers, etc. v. N. L. R. B., 366 U.S. 731, 581 S.Ct. 1603, 6 L.Ed.2d 762 (1961); N. L. R. B. v. Clegg, 8 Cir., 304 F.2d 168 (1962); N. L. R. B. v. Burke Oldsmobile, Inc., 2 Cir., 288 F.2d 14 (1961).

■ But the doctrine is not unlimited and absolute. N. L. R. B. v. Trosch, supra, 321 F.2d at 697. Indeed, even the Board has stated that the doctrine, "necessary though it is to protect freedom of choice in certain situations, can easily operate in derogation of the practice of continuous collective bargaining, and should, therefore, be strictly construed and sparingly applied." Ensher, Alexander & Barsoon, Inc., 74 NLRB 1443, 1445 (1947).

Courts have refused to apply the doctrine in factual settings where a real question of representation no longer existed because the employer, without illegal act or pressure, obtained indisputable proof of majority support for one of the competing unions without need of an election. N. L. R. B. v. North Electric Company, supra, 296 F.2d 137; N. L. R. B. v. Swift and Company, 3 Cir., 294 F.2d 285 (1961); District 50, United Mine Wkrs. v. N. L. R. B., 4 Cir., 234 F.2d 565 (1956); N. L. R. B. v. Indianapolis Newspapers, 7 Cir., 210 F.2d 501 (1954); and N. L. R. B. v. Standard Steel Spring Co., 6 Cir., 180 F.2d 942 (1950). Compare also, N. L. R. B. v. Wheland Company, 6 Cir., 271 F.2d 122 (1959), and Cleaver-Brooks Mfg. Corporation v. N. L. R. B., 7 Cir., 264 F.2d 637 (1959), cert. denied, 361 U.S. 817, 80 S.Ct. 58, 4 L.Ed. 2d 63 (1959). And the United States Supreme Court has indicated that an employer can take "reasonable steps to verify union claims" by cross-checking, for example, "well-analyzed employer records with union listings or authorization cards" and thus "readily ascertain their validity and obviate a Board election." International Ladies' Garment Workers, etc. v. N. L. R. B., supra, 366 U.S. at 739–740, 81 S.Ct. at 1608, 6 L.Ed.2d 762. And, as previously stated, in our view, the general tenor of the cases reveals that the mere filing by one union of a certification petition with the Board does not ipso facto—under all circumstances—preclude an employer from recognizing a rival union as the employees' bargaining representative.

■ Furthermore, the burden is upon the general counsel of the Board to prove his case by a preponderance of the evidence. N. L. R. B. v. Murray Ohio Manufacturing Company, supra, 326 F.2d at 513. As a refinement of this general rule, in a proceeding to determine whether an employer violated 8(a)(2) by recognizing one union while a rival union's certification petition was pending with the Board, the burden is upon the Board

to show that a real question concerning representation existed at the time of the allegedly unlawful recognition. William Penn Broadcasting Company, 93 NLRB 1104, 1106 (1951); N. L. R. B. v. Swift and Company, supra, 294 F.2d at 287. See also, International Ladies' Garment Wkrs. Union v. N. L. R. B., 108 U.S.App.D.C. 68, 280 F.2d 616, 622 (1960) affirmed, supra, 366 U.S. 731, 83 S.Ct. 1603, 6 L.Ed.2d 762. Of course, the Board's burden may be met by drawing reasonable inferences from established facts. N. L. R. B. v. Murray Ohio Manufacturing Company, supra, 326 F.2d at 513. See also, Riggs Distler & Company v. N. L. R. B., 4 Cir., 327 F.2d 575, 580 (1963); Rocky Mountain Gas Company v. N. L. R. B., 10 Cir., 326 F.2d 949, 951 (1964); N. L. R. B. v. Nelson Mfg. Co., 6 Cir., 326 F.2d 397, 398 (1964).

It is also important to note that Congress has entrusted the Board with a wide—but of course not unlimited—degree of discretion in establishing the procedures and safeguards necessary to insure the fair and free choice of bargaining representatives by employees. N. L. R. B. v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946); Surprenant Mfg. Co. v. Alpert, 1 Cir., 318 F.2d 396, 399 (1963); N. L. R. B. v. National Container Corp., 2 Cir., 211 F.2d 525, 532 (1954).

Here, the foregoing legal propositions are pertinent in varying degrees. We are cited to no case, however, where—as here—the employer is found guilty of an 8(a) (1) violation, does not seek a review of that determination, and yet does dispute a Board finding of an 8(a) (2) violation having for its foundation essentially the same unlawful conduct and activity upon which the 8(a) (1) violation is premised. Within this factual framework we must determine, not whether an 8(a) (1) violation in a competing union situation *necessitates* upholding an 8(a) (2) charge, but whether on this record the two charges are so interwoven that one is an integral part of the other; that the Board was warranted in concluding that the Independent did not *clearly* represent an uncoerced majority of the employees at the time of recognition and that a real question of representation existed. See International Ass'n of Machinists, etc. v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 (1940).

In contending that the Board's finding of the 8(a) (2) violation is not supported by substantial evidence, Company's position necessarily must be that its 8(a) (1) activities are wholly without relevance to the 8(a) (2) charge; that inasmuch as over 100 of its employees, a clear majority of the working force, indisputably signed the petition requesting recognition of Independent as the bargaining agent, it conclusively follows that there was no real question of representation existing on October 26, 1962, or at any time thereafter. We disagree.

The testimony of employees of Company clearly demonstrates that during the period that International and Independent were conducting organizational activities, Mr. Anderson and Company's supervisors were actively campaigning against International and discouraging Company employees from joining or supporting International. At meetings Anderson warned the employees that the plant would close down if they selected International; on one occasion the superintendent of the plant told the employees that the Fort Dodge operation would be closed and transferred to Company's Denison plant if International gained bargaining rights. Individual employees were threatened with economic reprisal if they joined or supported that organization.

One of the employees testified that the superintendent informed him that " * * if we associated with them kind of guys we would be out of a job." Another employee testified that he was informed by the president and the superintendent that "We don't like union blanks around here." And "You had better watch your step." The president told another employee, according to the latter's testimony, that "I am not going to fire you, but there's other ways of getting the job done. * * * You'd just better start turning things

around and start going the other way with it." Still another employee testified that at a meeting called by a Company superintendent the superintendent stated, "Andy has closed a plant down before, and he can do it again here * * *"— if the international union came into the plant. Joe Fitzgerald, another employee and who was chief steward of Independent, testified in part that at one of the meetings of the employees "Mr. Anderson stated 'I think everyone knows how I feel about the international union. * * I think they are a bunch of so-and-so's to put men out of work, and I don't want anything to do with them. I don't want them coming into this plant and tell me how to run it. * * * If they come in I'll shut her down. * * * I beat them in Denison; I'll beat them here * * *. If you don't believe me, try me. * * *' He said if he heard of anybody associating with or affiliating with the international they would go down the road." This witness further stated that although he was a member of Independent, his "first choice was, and would be, the international union."

And significantly, Anderson's activities to forestall employee organizations were directed only against International and no efforts were made by Company to discourage affiliation with Independent. One witness testified that Anderson told him "We are not going to have no union in this place * * * just a company union."

Under the foregoing facts—and additional pertinent evidence which need not be recited, what we said in Elastic Stop Nut Corp. v. N. L. R. B., supra, 142 F.2d at 375, a pre-Midwest Piping doctrine decision, is apropos here:

"At a time when the rival organizations * * * [are] still in a formative state, with opinion still divided and no definite decision reached as to which organization should be chosen, the employees * * * [are] sensitive to weight thrown by their employer in favor of one organization as against an-

other, even though the suggestion of preference be subtle or slight."

Unlike N. L. R. B. v. Standard Steel Spring Co., supra, 180 F.2d 942, 946— cited in District 50, United Mine Wkrs. v. N. L. R. B., supra, 234 F.2d at 570, here there was substantial evidence from which the Board could find that Company has interfered with the right of its employees to a fair, unhampered choice of their bargaining representative; that it has intruded its influence to assist or encourage, or to oppose or discourage adherence to a particular labor organization. Here, and again unlike the Standard Steel Spring Co. case, Company did enter a race between competing unions and did give one improper advantage during a campaign for the employees' favor. At least the Board could justifiably so find.

It is beyond dispute that an employer is not to meddle in labor union affairs; that when faced with rival representation claims he is required to maintain a strictly neutral position. Known hostility to one union and clear demonstration against it may indeed make seemingly trivial intimations of preference for another union powerful assistance to it. Even slight suggestions as to the employers' choice between unions may have telling effect among men who are aware of the consequences of incurring their employers' displeasure.

In summary, the active opposition to International by Company— known to its employees—throughout the period when the rival unions were vying for employees' support, was an important factor and certainly one for the Board to consider. We are satisfied that the record as a whole contains substantial evidence warranting the Board's finding that at the time Company recognized Independent a real question of representation existed, and entitling the portion of the Board's order finding a violation of 8(a)(2) to be enforced.

Proceeding to the 8(a)(4) violation, the trial examiner found that Company had violated this section by re-

fusing to hire one James Grove because Grove had filed with the Board an unfair labor practice charge against Company. Company does not in its brief take issue with this finding, and certainly a refusal to hire for such a reason is a clear violation of the Act. However, the examiner recommended that Company not be ordered to hire Grove because he had deliberately falsified his testimony while on the stand at the hearing and in the unfair labor charge which he filed.[5] In contrast, the Board concluded that Grove's conduct was not of the "deliberate and malicious" type requiring forfeiture of the remedy in order to effectuate the purposes of the Act and ordered Company to hire Grove and provide him with back pay.

 The Board has recognized that although an employee is unlawfully discharged, his reinstatement is not always warranted where the policies of the Act would not be effectuated by such reinstatement. O'Donnell's Sea Grill, 55 NLRB 828 (1944). See also, Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940).

 The question concerning Grove and the 8(a) (4) violation is primarily one of credibility. After thorough examination of the record as a whole, we are convinced that the trial examiner's determination of this question was a valid one, and that the Board's conclusion that the incorrect portion of Grove's charge was a result of a misunderstanding is not supported by substantial evidence. The record further demonstrates that Grove gave false testimony at the hearing. Under these circumstances, forfeiture of Grove's remedy is required to serve the policy of the Act, and, consequently, the Board's order requiring Company to offer Grove immediate employment with back pay is not entitled to enforcement.

In accordance with the opinion, we deny enforcement of and set aside that portion of the Board's order directing Company to hire James Grove with back pay. In all other respects enforcement of the Board's order is granted.

---

5. The examiner found "untruths, contradictions and inconsistencies" in Grove's testimony; "was not favorably impressed with his demeanor while testifying;" and determined that "Grove * * * on his own admission, testified that he had lied when he alleged in his charge that * * * [Company's President] told him he would never hire him."